## LOONEY, ATTORNEY GENERAL OF THE STATE OF TEXAS, *v.* CRANE COMPANY.

### APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF TEXAS.

No. 16.  Argued May 3, 1916; restored to docket for reargument May 21, 1917; reargued November 6, 1917.—Decided December 10, 1917.

Neither the right of a State to attach conditions when licensing a sister state corporation to do local business, nor its power to tax the corporation in respect of such business, when licensed, can sustain impositions which, in the guise of permit charges or franchise or excise taxes, result in direct burdens on interstate commerce or in the

---

taxation of property beyond the confines and jurisdiction of the State.

These principles, repeatedly affirmed by the court, are in nowise qualified by *Baltic Mining Co.* v. *Massachusetts*, 231 U. S. 68, and other recent cases, involving particular state statutes which were not inherently repugnant to the commerce clause or the due process clause of the Fourteenth Amendment, and which, because of their own restrictive provisions, avoided such repugnancy in their necessary operation and effect. Those cases lend no sanction to the proposition that the duty of enforcing the Constitution may depend upon the degree of violation or of resulting wrong.

In 1889, Texas exacted of foreign corporations a charge, graduated upon capital stock, but limited to $200, for a permit to do business for 10 years. In 1893, a so-called franchise tax of $10 per annum was exacted of domestic and licensed foreign corporations alike, which was increased in 1897 to a maximum of $50 for domestic corporations, while for foreign corporations the minimum was raised to $25, and the tax was otherwise calculated by fixed percentages upon capital stock without maximum limit. After some intervening modification, it was enacted in 1907, as to both classes of corporations, that, in case the capital stock, issued and outstanding, plus surplus and undivided profits, should exceed the capital stock authorized, the franchise tax should be calculated upon the aggregate of such amounts. In the same year the permit provisions were altered by abolishing the maximum limit ($200) and increasing the percentages on authorized capital stock. An Illinois manufacturing and trading corporation engaged largely in interstate commerce obtained a 10 year permit under the Act of 1889, purchased real estate, erected warehouses and engaged in business in Texas; paid its taxes on its local property, and also those laid under the franchise laws, until its permit (obtained in 1905) was about to expire, when it brought suit against the Secretary of State and the Attorney General to enjoin the enforcement by them of the permit and franchise laws of 1907. Its authorized capital stock was $17,000,-000, issued and paid up, and its surplus and undivided profits over $8,000,000. The total assessed value of its property in Texas was about $300,000. Its gross receipts and gross sales in all its business in 1913 were $39,831,000, of which only $1,019,750 had any relation to Texas, and of this nearly one-half had resulted from sales and shipments in interstate commerce. Its franchise tax had increased from $480 in 1904 to $1,948 in 1914, under the franchise Act of 1907. Its permit fee under the permit Act of 1907 would have been $17,040.

*Held*, that the franchise and permit taxes both violated the due process clause of the Fourteenth Amendment and directly burdened interstate commerce.

A suit to enjoin state officials from enforcing an unconstitutional tax is not a suit against the State.

218 Fed. Rep. 260, affirmed.

THE case is stated in the opinion.

*Mr. C. M. Cureton*, Assistant Attorney General of the State of Texas, with whom *Mr. Ben F. Looney*, Attorney General of the State of Texas, and *Mr. C. A. Sweeton*, Assistant Attorney General of the State of Texas, were on the briefs, for appellant:

The statutes in question do not seek to lay a charge or tax upon any foreign corporation seeking to do an interstate business only. *Alden* v. *Jones Buggy Co.*, 91 Texas, 22; *Gaar, Scott & Co.* v. *Shannon*, 223 U. S. 468; and other Texas cases. The State has a perfect right to charge for and tax the privilege of doing local business and measure the amount of the charge or tax by the capital of the corporation, including receipts or property employed in part in interstate commerce; and this is the rule although the transaction of intrastate business might not exceed one-fourth of its aggregate business and although the same might be a source of profit and convenience to it and in that way an aid to its interstate business. *Baltic Mining Co.* v. *Massachusetts*, 231 U. S. 68; *White Dental Mfg. Co.* v. *Massachusetts, ib.; Hammond Packing Co.* v. *Arkansas*, 212 U. S. 322; *Barron* v. *Burnside*, 121 U. S. 186; *United States Express Co.* v. *Minnesota*, 223 U. S. 335; *Maine* v. *Grand Trunk Ry. Co.*, 142 U. S. 217; *Provident Institution* v. *Massachusetts*, 6 Wall. 611; *Hamilton Company* v. *Massachusetts*, 6 Wall. 632; *Flint* v. *Stone Tracy Co.*, 220 U. S. 107; *Horn Silver Mining Co.* v. *New York*, 143 U. S. 305; *Pembina Mining & Milling Co.* v. *Pennsylvania*, 125 U. S. 181. It is important to bear in mind the distinction

between an ordinary trading corporation, like the appellee, and a corporation, such as a railroad or telegraph company, which by the very nature of its business is an instrument of commerce. Corporations of the latter class, when engaged in both kinds of commerce, cannot be made to pay a franchise tax measured by their entire capital stock because, by burdening the instrument of interstate commerce, the tax would be a burden upon interstate commerce itself. A trading corporation, *per contra*, can engage in interstate commerce or not, as it sees fit, and a tax according to its capital therefore cannot be said to burden the interstate commerce in which it elects to engage. The case is ruled by *Baltic Mining Co.* v. *Massachusetts, supra,* and *White Dental Mfg. Co.* v. *Massachusetts, supra.* Here, as there, the tax is not a property but a franchise tax. *Gaar, Scott & Co.* v. *Shannon,* 52 Tex. Civ. App. 644. The appellee has a substantial local business, subject to local franchise and privilege taxes. It would be an entirely new doctrine to hold that a prohibition of the business, or a tax in the nature of a condition upon its permission, amounts to a burden on the interstate business merely because appellee's voluntary methods make success in the one line of business in some measure dependent on the other.

The cases relied upon by appellee are either those in which the corporations were engaged exclusively in interstate commerce, or those in which they were operating instrumentalities of such commerce. *Western Union Telegraph Co.* v. *Kansas,* 216 U. S. 1; *Pullman Company* v. *Kansas,* 216 U. S. 56; *Ludwig* v. *Western Union Telegraph Co.,* 216 U. S. 146; *Western Union Telegraph Co.* v. *Andrews,* 216 U. S. 165; *Pensacola Telegraph Co.* v. *Western Union Telegraph Co.,* 96 U. S. 1; *Adams Express Co.* v. *City of New York,* 232 U. S. 14; *Platt* v. *City of New York,* 232 U. S. 35; *Myer* v. *Wells, Fargo & Co.,* 223 U. S. 298; *Williams* v. *City of Talladega,* 226 U. S. 404; *Buck Stove &*

*Range Co.* v. *Vickers,* 226 U. S. 205; *International Textbook Co.* v. *Pigg,* 217 U. S. 91.

Appellee's Texas business was mainly intrastate. One-fourth of the goods was sold in broken packages. The original packages were mingled with these and exposed with them for sale, thus becoming incorporated with the mass of the property in the State. *Brown* v. *Houston,* 114 U. S. 622; *State* v. *Intoxicating Liquors,* 65 Maine, 556.

If the statutes in question be valid, the suit is in essence a suit against the State.

The permit fee and franchise tax acts are distinct and independent. The fee is calculated on the basis of authorized capital stock, not on actual capital, and the tax would be the same whether the corporation had no capital or had capital greatly in excess of the amount authorized. In no sense is it a property tax. In this case it is of relatively small amount. Payable only once every ten years, it comes to but 1% of the authorized capital in 100 years. This is small compared with the enormous authorized capital; and the charge is not exacted from the capital used in interstate commerce. The absence of a limit is immaterial, for just as the tax could not be saved, however small, if levied on the receipts from interstate commerce, so its mere amount could not condemn it if it does not touch property at all. See *Pick & Co.* v. *Jordan,* 169 California, 1, affirmed by this court in 244 U. S. 647. If the fee were large, so is the privilege granted. It was for the legislature to value the privilege and for the Crane Company to decline it if unwilling to pay the price.

The other tax is not a property but a privilege or franchise tax. *Gaar, Scott & Co.* v. *Shannon,* 52 Tex. Civ. App. 644. Surplus or undivided profits are considered, but only for the purpose of measuring the value of the franchise. The legislature doubtless found a reasonable relationship between that value and the capital in use. The tax does

not necessarily fluctuate with the amount of interstate business. The real question is whether or not it is greater than the value of the privilege granted. If the tax should be held void in so far as measured by surplus and profits, it may still be upheld in so far as measured by the authorized capital stock. *Field* v. *Clark,* 143 U. S. 696; *Huntington* v. *Worthen,* 120 U. S. 102; *Zwerneman* v. *Von Rosenberg,* 76 Texas, 522; *State* v. *Laredo Ice Co.,* 96 Texas, 461.

If the present acts be void, their predecessors are not and the company, refusing to comply with the latter, is not entitled to injunctive relief.

*Mr. Joseph Manson McCormick,* with whom *Mr. Francis Marion Etheridge* was on the briefs, for appellee.

MR. CHIEF JUSTICE WHITE delivered the opinion of the court.

Chartered in 1865 by the legislature of Illinois, the Crane Company had its domicile and principal establishment at Chicago. It carried on its chartered business of manufacturing and dealing in hardware, railway supplies, building materials, agricultural implements, etc., not only in Illinois but in other States, by the shipment of merchandise on orders obtained through the solicitation of its agents and sent to Chicago for execution, or orders sent to Chicago through the mail. The company, moreover, established agencies in other States to which goods were also shipped from Chicago or from other points where they were bought and shipment directed, from which agencies such goods were sold and delivered either in the original or broken packages as was most convenient. Such agencies also became supply depots from which interstate commerce was carried on by filling orders received from other States.

In the State of Texas for the purpose of facilitating the carrying on of its business by all the methods stated, the company acquired real estate at Dallas, and built a depot or warehouse, and also had a warehouse at another place in the State.

In 1889 Texas enacted a statute entitled, "An act to require foreign corporations to file their articles of incorporation with the secretary of state, and imposing certain conditions upon such corporations transacting business in this state. . . ." (Acts of 1889, p. 87.) This act not only compelled the filing of the charter with the Secretary of State, but exacted for a permit to do business a minimum charge of $25 based upon $100,000 of capital stock and an increased amount predicated upon capital stock until the exaction amounted to $200, which was the limit, and the permit which was authorized to be issued by the Secretary of State was limited to ten years' duration. The tax imposed therefor, if the permit was enjoyed for the stated period, could not in any event exceed $20 a year, whatever might be the amount of capital stock of the corporation.

As early as 1893 what was denominated a franchise tax was provided, imposing upon each and every domestic as well as foreign corporation having a permit the duty of paying $10 a year. (Acts of 1893, p. 158.) In 1897 this described franchise tax was modified. (Acts of 1897, p. 168.) As to domestic corporations, while retaining the minimum charge of $10, the maximum was raised to $50. And as to foreign corporations the minimum was raised from $10 to $25 and the maximum limit was removed by fixing percentages of charges upon the capital stock, increasing without limitation. Without in detail following the legislation as to taxes denominated as franchise from the date stated down to the period when this suit was commenced, it suffices to say that the tax itself was preserved with some increases in the bases upon which

it was to be calculated; but in 1907 it was enacted both as to domestic and permitted foreign corporations that in case the capital stock of a corporation "issued and outstanding, plus its surplus and undivided profits, shall exceed its authorized capital stock," the franchise tax should be calculated upon the aggregate of such amounts, thereby increasing to that extent the levy. (Acts of 1907, p. 503; Revised Statutes, 1911, Art. 7394.)

The authorized capital stock of the Crane Company was $17,000,000, which was paid up and issued, and just prior to the institution of this suit the surplus and undivided profits of the company amounted to $8,139,000. The total assessed value in Texas of its real estate, money there employed and merchandise there held amounted to $301,179. The company's gross receipts and gross sales in all its business in all the States for the year 1913 amounted to $39,831,000, of which only $1,019,750 had any relation to the State of Texas and nearly one-half of this amount was the result of transactions purely of an interstate commerce character arising from the sale and shipment of goods from other States to purchasers in Texas who ordered them and from the shipment from Texas to other States for the purpose of filling orders sent from such States.

The Crane Company was assessed and paid taxes in Texas as other taxpayers on its real estate, its money on hand in Texas and its stock in trade in that State. In 1905, having filed its articles of incorporation with the Secretary of State, it paid the permit tax of $200 for the ten-year period as prescribed by the permit Act of 1889. From 1904 down to and including 1914 the company paid the yearly franchise tax, the amount increasing from $480 in 1904 to $1948 in 1914, the increase presumably resulting from the increase of rate of such tax by the legislation which we have indicated and from the fact that by the amendment of the Act of 1907 the surplus and un-

divided profits of the company became susceptible of
being taken into view in addition to its authorized capital
stock.

In the same year in which the legislation was enacted
providing for the taxation on the basis of surplus and un-
divided profits for the purpose of the franchise tax there
was also enacted a law vastly increasing the amount of
the permit tax. (Acts of 1907, S. S., p. 500; Revised Stat-
utes, 1911, Art. 3837.) We say vastly increasing because,
although the standard for the levy of that tax, the author-
ized capital stock, was retained, the maximum limit which
was $200 for ten years under the previous law was re-
moved and the percentages of levy on the authorized capi-
tal stock were so augmented that the permit for which
the company paid to the Secretary of State $200 for ten
years in 1905 under the new law would have required
the company to pay in order to do business in the State
the sum of $17,040.

Shortly before its existing permit for ten years taken in
1905 expired the company commenced the present suit
in the court below against the Secretary of State and the
Attorney General to enjoin the enforcement by them of
the statutes embracing the permit tax and the franchise
tax on the grounds that both were repugnant, *a*, to the
commerce clause of the Constitution of the United States
because imposing a direct burden on interstate commerce;
*b*, to the due process clause of the Fourteenth Amend-
ment because constituting a taking of property; and *c*,
to the equal protection clause of the Fourteenth Amend-
ment based upon what were urged to be discriminatory
provisions in the acts. The parties having been fully
heard on an application for an interlocutory injunction
on the pleadings and by affidavits from which the case
as we have stated it indisputably results, by a court or-
ganized under the Act of Congress of June 18, 1910
(36 Stat. 557, c. 309, § 17; Judicial Code, § 266), the in-

terlocutory injunction was granted and the enforcement of the laws restrained, the matter being now before us on an appeal from such order. 218 Fed. Rep. 260.

Passing the contention as to the denial of the equal protection of the laws, which as we shall see it is unnecessary to consider, we come to dispose of the two other contentions, that is, the direct burden on interstate commerce and the want of due process.

It may not be doubted under the case stated that intrinsically and inherently considered both the permit tax and the tax denominated as a franchise tax were direct burdens on interstate commerce and moreover exerted the taxing authority of the State over property and rights which were wholly beyond the confines of the State and not subject to its jurisdiction and therefore constituted a taking without due process. It is also clear, however, that both the permit tax and the franchise tax exerted a power which the State undoubtedly possessed, that is, the authority to control the doing of business within the State by a foreign corporation and the right to tax the intrastate business of such corporation carried on as the result of permission to come in. The sole contention, then, upon which the acts can be sustained is that although they exerted a power which could not be called into play consistently with the Constitution of the United States, they were yet valid because they also exercised an intrinsically local power. But this view can only be sustained upon the assumption that the limitations of the Constitution of the United States are not paramount but are subordinate to and may be set aside by state authority as the result of the exertion of a local power. In substance, therefore, the proposition must rest upon the theory that our dual system of government has no existence because the exertion of the lawful powers of the one involves the negation or destruction of the rightful authority of the other. But original discussion is

unnecessary since to state the proposition is to demonstrate its want of foundation and because the fundamental error upon which it rests has been conclusively established. Indeed the cases referred to were concerned in various forms with the identical questions here involved and authoritatively settled that the States are without power to use their lawful authority to exclude foreign corporations by directly burdening interstate commerce as a condition of permitting them to do business in the State in violation of the Constitution, or because of the right to exclude to exert the power to tax the property of the corporation and its activities outside of and beyond the jurisdiction of the State in disregard, not only of the commerce clause, but of the due process clause of the Fourteenth Amendment. *Western Union Telegraph Co.* v. *Kansas*, 216 U. S. 1; *Pullman Company* v. *Kansas*, 216 U. S. 56; *Ludwig* v. *Western Union Telegraph Co.*, 216 U. S. 146; *International Textbook Co.* v. *Pigg*, 217 U. S. 91; *Atchison, Topeka & Santa Fe Ry. Co.* v. *O'Connor*, 223, U. S. 280, 285.

The dominancy of these adjudications is plainly shown by the fact that as the result of the decision in the leading case (*Western Union Telegraph Co.* v. *Kansas*, 216 U. S. 1), the Supreme Court of the State of Texas, recognizing the repugnancy of the permit tax law here in question to the Constitution of the United States, enjoined its enforcement (*Western Union Telegraph Co.* v. *State*, 103 Texas, 306), and following that ruling the legislature of the State has amended both the permit tax law and the franchise tax law now before us, presumably in an effort to cure the demonstrated repugnancy of the statutes, before amendment, to the Constitution of the United States. Of course, whether the amendments as adopted accomplished the purpose intended, is a matter which we are not called upon to consider and as to which we express no opinion.

But despite the controlling decisions dealing with cases in substance identical in fact and principle with the case here presented and the effect given to them in Texas as to one of the statutes here involved, it is now insisted that the statutes are not repugnant to the Constitution of the United States and that error was committed in deciding to the contrary. This is rested on cases decided since those to which we have referred. *Baltic Mining Co.* v. *Massachusetts,* 231 U. S. 68; *St. Louis Southwestern Ry. Co.* v. *Arkansas,* 235 U. S. 350; *Kansas City, Fort Scott & Memphis Ry. Co.* v. *Kansas,* 240 U. S. 227; *Kansas City, Memphis & Birmingham R. R. Co.* v. *Stiles,* 242 U. S. 111. The proposition is, therefore, that these cases overruled the previous decisions. The incongruity of the contention will be manifest when it is observed that not only did the cases relied upon contain nothing expressly purporting to overrule the previous cases, but on the contrary in explicit terms declared that they did not conflict with them and that they proceeded upon conditions peculiar to the particular cases.

The demonstration of error in the argument which results from this situation might well cause us to go no further in its consideration. In view, however, of the gravity of the subject to which the argument relates and the misconception and resulting confusion in doctrine which might result from silence, we briefly notice it. In the first place it is apparent in each of the cases that as the statutes under consideration were found not to be on their face inherently repugnant either to the commerce or due process clause of the Constitution, it came to be considered whether by their necessary operation and effect they were repugnant to the Constitution in the particulars stated, and this inquiry it was expressly pointed out was to be governed by the rule long ago announced in *Postal Telegraph Cable Co.* v. *Adams,* 155 U. S. 688, 698, that "The substance and not the shadow

determines the validity of the exercise of the power." In the second place, in making the inquiry stated in all of the cases, the compatibility of the statutes with the Constitution which was found to exist resulted from particular provisions contained in each of them which so qualified and restricted their operation and necessarily so limited their effect as to lead to such result. These conditions related to the subject-matter upon which the tax was levied, or to the amount of taxes in other respects paid by the corporation, or limitations on the amount of the tax authorized when a much larger amount would have been due upon the basis upon which the tax was apparently levied. It is thus manifest on the face of all of the cases that they in no way sustained the assumption that because a violation of the Constitution was not a large one it would be sanctioned, or that a mere opinion as to the degree of wrong which would arise if the Constitution were violated was treated as affording a measure of the duty of enforcing the Constitution.

It follows, therefore, that the cases which the argument relies upon do not in any manner qualify the general principles expounded in the previous cases upon which we have rested our conclusion, since the later cases rested upon particular provisions in each particular case which it was held caused the general and recognized rule not to be applicable.

Some suggestion is made in argument of the possibility of treating the franchise tax as not repugnant to the Constitution although that result be necessarily reached as to the permit tax. But we are of opinion that the proposition is without merit as the interdependence of the two provisions obviously results from the character of the subjects with which they deal and the mode in which the statutes deal with them. Indeed that conclusion would seem to necessarily follow from the legislative history of both and the concordant nature of their develop-

ment. It finds additional and strongly persuasive support from the fact that although the controlling effect of the ruling in *Western Union Telegraph Co.* v. *Kansas, supra,* was applied by the state court to only one of the statutes, the permit tax, when the curative power of legislation was exerted it was made applicable to both and both were therefore modified. Aside from this view, however, as, from the history which we have given of the franchise tax, its provisions were clearly intended to reach all activities and property of the corporation wherever situated, that statute when separately considered would come directly within the control of the doctrine of the previous cases upon which our conclusion is based.

There is a contention to which we have hitherto postponed referring, that the court below was without jurisdiction because the suit against the state officers to enjoin them from enforcing the statutes in the discharge of duties resting upon them was in substance and effect a suit against the State within the meaning of the Eleventh Amendment. But the unsoundness of the contention has been so completely established that we need only refer to the leading authorities. *Ex parte Young,* 209 U. S. 123; *Western Union Telegraph Co.* v. *Andrews,* 216 U. S. 165; *Home Telephone & Telegraph Co.* v. *Los Angeles,* 227 U. S. 278.

It follows from what we have said that the court below was right in awarding an interlocutory injunction to restrain the enforcement of the assailed statutes and its order so doing must be and the same is

*Affirmed.*