THE STATE OF NEVADA ON THE RELATION OF THE TEXAS COMPANY, A CORPORATION, RELATOR, v. JOHN KOONTZ, AS SECRETARY OF STATE OF THE STATE OF NEVADA, RESPONDENT.

No. 3682

January 29, 1952.                    240 P.2d 525.

John S. Sinai and John S. Belford, of Reno, for Relator.

W. T. Mathews, Attorney General, George P. Annand, Robert L. McDonald, Thomas A. Foley, Deputy Attorneys General, of Carson City, for Respondent.

## OPINION

By the Court, MERRILL, J.:

The Texas Company is a Delaware corporation engaged, generally, in the business of manufacture and sale of petroleum products and development of petroleum resources. It is engaged in business in every state of the United States. As hereinafter related, it was admitted to do local business in the State of Nevada in 1941. The business since then and now carried on by the company in this state consists of the distribution and sale of products shipped into the state from outside points. None of its products is produced, manufactured or processed within the state. Assets of the company located within the state consist solely of products or merchandise brought into the state and of facilities, such as bulk sales plants and service stations, used in the local distribution and sale of such products and merchandise.

Nine bulk sales plants located within the state receive

products direct through interstate shipments and distribute them locally to resellers and consumers in their respective areas. One of these plants is owned and operated by the company itself. Of the remaining plants, two purchase the products direct from the company. The rest operate as consignees of the products received, with title to the products remaining in the company until delivery by the consignee to the purchaser and with proceeds of sales collected for the company by the consignee. Of its business in this state, over 97 percent consists of sales made directly or through consignees. The remaining income is derived from the operation and leasing of properties within the state.

The business done in Nevada and the assets here located constitute an exceedingly small percentage of the company's total business and assets. The figures for 1950 (which company officials estimate will substantially represent the figures for 1951) show that business done in Nevada (of a total volume of $1,490,277.69) constitutes one-tenth of 1 percent of the company's total business. Assets owned by the company and here located constitute 2½ hundredths of 1 percent of the company's total assets.

It is clear from the record before us that the greater portion of the business done in this state constitutes interstate commerce and that such business as is purely local in character is so closely connected with the interstate operations as practically to constitute an extension of those operations.

On October 24, 1941, the company's total authorized capital stock was in the sum of $350,000,000. On that date it qualified itself to do local business within the State of Nevada by filing with the secretary of state of Nevada a copy of its articles of incorporation pursuant to the provisions of sec. 1841 N.C.L. 1929. Sec. 1842 N.C.L. 1929 (then as now) required payment of filing fees by foreign corporations in the same amount as fees paid by domestic corporations. Sec. 7421.01 N.C.L. 1929, Supp. 1931–1941, provided fees (for the filing by

domestic corporations of articles and of amendments to articles increasing authorized capital stock) fixed by a graduated scale based upon total authorized capital. Upon the filing of its articles the company accordingly paid the statutory fee of $7,350 computed upon its then total authorized capital. At that time sec. 1841 N.C.L. 1929 contained no requirements that foreign corporations file with the secretary of state copies of any amendments which might subsequently be made of their articles.

Effective March 29, 1949, sec. 1841 N.C.L. was amended to require that:

"Any foreign corporation qualified to transact business in this state shall, upon the filing in the state of its creation of any paper, document or instrument amendatory of, supplemental to, or otherwise related to the instrument of its creation, and which, pursuant to the laws of the place of its creation are to be filed or recorded therein shall forthwith file with the secretary of state of this state a copy thereof, * * *."

At the same time, the amounts of filing fees provided by sec. 7421.01 were substantially increased by amendment of that section.

Effective April 28, 1949, the company's articles were amended to increase its authorized capital to $500,000,-000, such amendment being accomplished under the laws of Delaware by filing a copy of such amendment with the secretary of state of Delaware. On October 6, 1949, the company tendered to respondent secretary of state a copy of said amendment and demanded that the same be filed without exaction of a fee. Respondent refused to file the same unless the then statutory fee in the sum of $15,000 were paid.

Effective March 22, 1951, sec. 7421.01 was again amended to increase the amounts of fees payable by corporations. Effective April 24, 1951, the company's articles again were amended pursuant to Delaware law to increase its authorized capital to $1,000,000,000. On June 11, 1951, the company made tender to respondent

secretary of state of a copy of its second amendment with demand that it be filed without exaction of fee. Respondent refused to file unless the then statutory fee in the sum of $97,500 be paid.

The company's demand on both occasions was based upon its contention that the statutory fee, under the circumstances, was invalid as a violation of the commerce clause of the United States constitution, art. 1, sec. 8, cl. 3, and of the due process clause of the fourteenth amendment. Based upon these same contentions the company as relator has now applied to this court for a writ of mandate requiring respondent to file copies of both amendments "without fee or charge therefor."

Respondent has interposed a demurrer to relator's petition and has also responded upon the merits. The demurrer challenges the propriety of mandamus in such a case.

Respondent's first contention in this regard is that the duty the performance of which relator here seeks to compel, that of filing the corporate amendments, cannot be separated from the obligation to collect the statutory fees for such filing; that the law does not enjoin any duty upon him such as that relator would impose: a duty to file without collection of fees.

The statutes, however, secs. 1841 and 7421.01, respectively, impose two distinct duties: that of filing and that of collection of fees. If the filing fee be constitutional, then the collection thereof properly could be made a condition to the performance of the duty of filing. On the other hand, if it be held unconstitutional, then its collection could not be regarded as a proper condition. The duty to file would nevertheless remain: a ministerial act the performance of which could be compelled by mandamus. We therefore regard this proceeding as a proper method of determining the constitutionality of the statute requiring the payment of the fees in question.

Respondent next contends that relator has a plain, speedy and adequate remedy at law through payment

of the statutory fees and thereafter bringing suit to recover them under the provisions of secs. 6637–6644 N.C.L. 1929. Relator points out that even should judgment eventually be secured, the recovery of such judgment would still remain somewhat of a problem. Our attention is directed to the provisions of sec. 6644 N.C.L. 1929 which states:

"For the purpose of paying the state's proportion of any refund of money which may be made to claimants under this act, the sum of one thousand dollars annually is hereby appropriated out of any moneys in the general fund of the state treasury not otherwise appropriated, any surplus therefrom to revert to the general fund."

Even without regard to other demands upon the fund thus provided and assuming its continued existence out of moneys "not otherwise appropriated" and that the whole thereof might annually be applied to payment of relator's claim, it would still appear that over 97 years would be required for relator to recover the amount paid by it. Aside from questions whether the remedy thus provided be plain and adequate in other respects, relator contends that the time element alone would preclude it from being regarded as adequate and that it can hardly be characterized as speedy. With this view we are constrained to agree.

The demurrer of respondent is overruled.

We come, then, to the question of the validity of our statutory requirement of a fee for the filing by foreign corporations of amendments to their articles of incorporation, so far as that requirement applies to the relator. Relator's contentions are that, computed as the fee is upon its total authorized capital stock, it constitutes a burden upon interstate commerce and a tax upon property beyond the jurisdiction of the state; that accordingly, the requirement violates both the commerce clause of the United States constitution and the due process clause of the fourteenth amendment.

In dealing with questions of this federal character we are, of course, bound by the holdings of the United States supreme court. Charges upon foreign corporations computed upon their total authorized capital stock have been the subject of an extensive series of decisions by that court, throughout which the law applying to such charges has developed. Neither the course of that development, however, nor the rationale of its controlling principles can be said to be clear and consistent throughout. As was stated by Mr. Justice Van Devanter in the course of one of the pertinent decisions:[1]

"Cases involving the validity of state legislation of this character often have been before this court. The statutes considered have differed greatly, as have the circumstances in which they were applied, and the questions presented have varied accordingly. In disposing of these questions there has been at times some diversity of opinion among the members of the court, and some of the decisions have not been in full accord with others."

Mr. Justice Frankfurter, more recently has made this enlightening comment:[2]

"Constitutional provisions are often so glossed over with commentary that imperceptibly we tend to construe the commentary rather than the text."

As a result much confusion has existed among the state courts faced with the necessity for determining the current state of the law. Many have been the occasions when state courts, confronted with a new and clarifying federal opinion, have been compelled to overrule their earlier decisions as erroneous interpretations of the significance of the supreme court's prior holdings.

Venturing, as we are for the first time, into this uncertain field, we feel justified in indulging in a more comprehensive discussion of the applicable rules and

[1]International Paper Co. v. Massachusetts, 246 U.S. 135, 38 S.Ct. 292, 293, 62 L.Ed. 624, 629, Ann.Cas.1918C, 617.
[2]State of Wisconsin v. J. C. Penney Co., 311 U.S. 435, 61 S.Ct. 246, 250, 85 L.Ed. 267.

principles than would ordinarily be our practice. For purposes of clarity, our opinion proper will be confined to a comparatively brief recital of the pertinent rules and principles (as we construe them to have emerged from their course of development to date) and shall leave statements of authoritative source and more detailed explanatory matter to footnotes.

These principles, then, we deem to have been established:

■■■■■■■■■■■

*First:* While a state may not prohibit a foreign corporation from engaging in interstate commerce within its boundaries,[3] it does have inherent power to prohibit such a corporation from engaging in intrastate or local commerce within its boundaries. Accordingly, it may, in admitting such corporations to do local business, impose upon their admission such conditions as it may choose.[4] Further, the fact that interstate commerce is already being carried on within the state, does not carry with it any right to engage in intrastate commerce in connection therewith. That right remains for the state to grant.

■■■■■■■■■■■

*Second:* A state may, as a condition of entrance of a foreign corporation to the state for the purpose of engaging in local business, require payment of a filing fee

[3]Alpha Portland Cement Co. v. Massachusetts, 268 U.S. 203, 45 S.Ct. 477, 69 L.Ed. 916, 44 A.L.R. 1219.

[4]This venerable rule is traceable back through countless decisions of the supreme court to Bank of Augusta v. Earle, 13 Pet. 519, 10 L.Ed. 274, and Paul v. Virginia, 8 Wall. 168, 19 L.Ed. 357, 360. In the latter case it was stated: "Having no absolute right of recognition in other States, but dependent for such recognition and the enforcement of its contracts upon their assent, it follows, as a matter of course, that such assent may be granted upon such terms and conditions as those States may think proper to impose. They may exclude the foreign corporation entirely; they may restrict its business to particular localities, or they may exact such security for the performance of its contracts with their citizens as in their judgment will best promote the public interest. The whole matter rests in their discretion."

■

reckoned upon total authorized capital stock. Even though the corporation be engaged in interstate commerce, this does not constitute a burden upon such commerce nor a tax upon property beyond the state's jurisdiction.[5] Indeed, a charge imposed as a condition

[5]Atlantic Refining Co. v. Virginia, 302 U. S. 22, 58 S.Ct. 75, 77, 82 L.Ed. 24, 28. The language of Mr. Justice Brandeis in this opinion casts considerable light upon the reasons for such a rule.

"* * * Whether the privilege [of engaging in intrastate commerce in Virginia] shall be granted to a foreign corporation is a matter of state policy. Virginia might refuse to grant the privilege for any business or might grant the privilege for some kinds of business and deny it to others. [A footnote at this point discloses that "Virginia does, in fact, refuse to foreign corporations the privilege of doing any intrastate public service business."] It might grant the privilege to all corporations with small capital while denying the privilege to those whose capital or resources are large. It might grant the privilege without exacting compensation; or it could insist upon a substantial payment as a means of raising revenue.

"As the entrance fee is not a tax, but compensation for the privilege applied for and granted, no reason appears why the State is not as free to charge $5,000 for the privilege as it would be to charge that amount for a franchise granted to a local utility, or for a parcel of land which it owned.

"* * * The payment required is a single, non-recurrent charge— a payment in advance for a privilege extending into the long future.

"No matter how large the company's local business may be, no matter how much, or how often, its issued capital may be increased, no additional entrance fee is payable. * * * Nor is it unreasonable to base the fee upon the amount of capital authorized at the time of the application, instead of charging a fee based upon the amount of the capital then issued, or upon the amount of assets then owned, and exacting later additional fees if, and when, more capital stock is issued or more assets are acquired. By fixing the fee in accordance with the capital authorized at the time of the application for admission, the State relieves itself of the necessity of keeping watch of changes in the future in these respects.

"It is contended that a fee measured solely by the amount of the corporation's authorized capital stock necessarily burdens interstate commerce. In support of that contention it is said that the authorized capital stock represents property located in forty-seven States and several foreign countries used in both interstate and foreign commerce. But this is not true. Authorized capital has no necessary relation to the property actually owned or used by the corporation; furthermore, the fee for which it is the measure represents simply the privilege of doing a local business. Because the entrance fee does not represent either property or business being done, it is immaterial that in fixing its amount no apportionment is made

of original entrance cannot be said to burden commerce in any respect: not interstate commerce, since "entrance" to the state for the purpose of doing local business is not necessary to the engaging in such commerce (in the sense that permission of the state is required) ; nor upon intrastate commerce, since until entrance, such commerce does not exist.

between the property owned or the business done within the State and that owned or done elsewhere.

"The entrance fee is obviously not a charge laid upon interstate commerce; nor a charge furtively directed against interstate commerce; nor a charge measured by such commerce. Its amount does not grow or shrink according to the volume of interstate commerce or the amount of the capital used in it. The size of the fee would be exactly the same if the company did no interstate commerce in Virginia or elsewhere. The entrance fee is comparable to the charter, or incorporation, fee of a domestic corporation—a fee commonly measured by the amount of the capital authorized. It has never been doubted that such a charge to a domestic corporation whatever the amount is valid, although the company proposes to engage in interstate commerce and to acquire property also in other states. * * *

"* * * As has been shown, the amount of the entrance fee is not measured by property, either within or without the jurisdiction; and it is not a tax upon property. It is payment for an opportunity granted.

"Nor is it a charge arbitrary in amount. The value of the privilege acquired is obviously dependent upon the financial resources of the corporation—not only upon the capital possessed at the time of its admission to do business, but also upon the capital which it will be in a position to secure later through its existing authority to issue additional stock. Obviously the power inherent in the possession of large financial resources is not dependent upon, or confined to, the place where the assets are located. * * * Great power may be exerted by the company in Virginia although it has little property located there. And the value to it of the privilege to exert that power is not necessarily measured by the amount of the property located, or by the amount of the local business done, in Virginia."

Dealing with what Mr. Justice Brandeis characterized as the privilege of exerting great financial power, the court stated in Ford Motor Co. v. Beauchamp, 308 U.S. 331, 336, 60 S.Ct. 273, 276, 84 L.Ed. 304, 306:

"In a unitary enterprise, property outside the state, when correlated in use with property within the state, necessarily affects the worth of the privilege within the state. Financial power inherent in the possession of assets may be applied, with flexibility, at whatever point within or without the state the managers of the business may determine. For this reason it is held that an entrance fee may be properly measured by capital wherever located."

[Headnote 7]

*Third:* It is not necessary that such a condition of entrance be wholly precedent to entrance.[6] Such conditions may be imposed as conditions subsequent or as to the future, provided they were so imposed at the time of the corporation's original entrance to the state and thus in fact constituted conditions of original "entrance."[7] The effect of the occurrence of circum-

---

[6]The language and implications of Hanover Fire Insurance Co. v. Carr, 272 U.S. 494, 47 S.Ct. 179, 71 L.Ed. 372, to the contrary notwithstanding.

[7]Lincoln National Life Insurance Co. v. Read, 325 U.S. 673, 65 S.Ct. 1220, 89 L.Ed. 1861; Montgomery Ward & Co. v. Corporation & Securities Commission, 312 Mich. 117, 20 N.W.2d 127; See also: Asbury Hospital v. Cass County, 326 U.S. 207, 66 S.Ct. 61, 90 L.Ed. 6. The Lincoln National Life Insurance Co. case and the Hanover Fire Insurance Co. case dealt with a different type of tax and involved a different constitutional provision: the equal protection clause. They were, however, concerned with the matter of entrance fees. In the latter case it was stated: (47 S.Ct. 183)

"In subjecting a law of the state which imposes a charge upon foreign corporations to the test whether such a charge violates the equal protection clause of the Fourteenth Amendment, a line has to be drawn between the burden imposed by the state for the license or privilege to do business in the state and the tax burden which, having secured the right to do business, the foreign corporation must share with all the corporations and other taxpayers of the state. With respect to the admission fee, so to speak, which the foreign corporation must pay to become a quasi citizen of the state and entitled to equal privileges with citizens of the state, the measure of the burden is in the discretion of the state and any inequality as between the foreign corporation and the domestic corporation in that regard does not come within the inhibition of the Fourteenth Amendment; but after its admission, the foreign corporation stands equal and is to be classified with domestic corporations of the same kind.

"In this class of cases, therefore, the question of the application of the equal protection clause turns on the stage at which the foreign corporation is put on a level with domestic corporations in engaging in business within the state. * * * the question * * * whether the law complained of is a part of the condition upon which admission to do business of the state is permitted and is merely a regulating license by the state to protect the state and its citizens in dealing with such corporation, or whether it is a tax law for the purpose of securing contributions to the revenue of the state as they are made by other taxpayers of the state."

The court held the tax in question was not a condition upon which admission to do business in the state was permitted and consequently held it invalid as a violation of the equal protection clause.

stances bringing such conditions subsequent into play is, theoretically, to place the corporation outside the state and once again seeking entrance. It once again, theoretically, is in its original position of seeking the initial right to engage in local business. Thus such conditions subsequent cannot be said to burden interstate commerce or constitute unconstitutional conditions of entrance any more than upon the corporation's original entrance to the state. The position of the corporation is deemed to remain the same.[8]

In the Lincoln National Life Insurance Co. case, the court considered an Oklahoma statute providing an entrance fee of $200 for foreign insurance companies and thereafter annual "entrance fees" computed on the gross premiums received during the preceding calendar year. Domestic corporations were exempt from this fee. The tax was attacked as violating the equal protection clause. The supreme court upheld the tax. The Hanover Fire Insurance Co. case was distinguished, the court pointing out that there the foreign corporation, upon being admitted to the state, had received an "unequivocal" license to do business. "In the present case each annual license, pursuant to the provisions of the Oklahoma constitution, was granted on condition. * * *" The court quoted from Fire Association of Philadelphia v. New York, 119 U.S. 110, 119, 7 S.Ct. 108, 113, 30 L.Ed. 342, 347, as follows:

"The State, having the power to exclude entirely, has the power to change the conditions of admission at any time, for the future, and to impose as a condition the payment of a new tax, or a further tax, as a license fee. If it imposes such license fee as a prerequisite for the future, the foreign corporation, until it pays such license fee, is not admitted within the State or within its jurisdiction. It is outside, at the threshold, seeking admission, with consent not yet given."

[8]Application to the fee involved in the case at bar of this principle and of the law of the Lincoln National Life Insurance Co. case, involves the determination that such a filing fee constitutes a valid condition subsequent to the original admission of the corporation to the state: a condition as to the future upon which the corporation's admission to do business was permitted. Such is the clear inference of the language of Mr. Justice Brandeis in the Atlantic Refining Co. case as quoted in footnote 5. If one accepts the propriety of the fee there involved as a condition precedent to original entrance, and the compelling reasons for its propriety as there set forth, it must follow that a state properly may protect itself as to the future in such respects by the requirement that amendments to articles be filed and that fees be paid therefor computed upon the increase in authorized capital. Such was the precise holding in Montgomery Ward & Co. v. Corporation & Securities Commission, supra.

[Headnote 8]

*Fourth:* However (subject to certain rather vaguely delineated exceptions),[9] once a foreign corporation is admitted to a state and is engaged therein in both local and interstate business, a tax by that state based upon the total authorized capital stock of the corporation is invalid as a violation of both the commerce clause and the due process clause.[10]

[Headnote 9]

*Fifth:* Under the preceding rule, once a foreign corporation has been granted permission to enter a state for the purpose of doing local business and thereafter engages in both local and interstate business, a fee purporting to be an "entrance fee," provided by a statute subsequently enacted and based upon its total authorized capital stock cannot constitutionally be demanded of it by what would in effect be a retroactive application.[11]

In application of these principles to the case at bar,

[9]Indicating generally that the charge in question had by its terms provided a reasonable segregation of local from interstate business and confined its application to the local business thus segregated. Baltic Mining Company v. Massachusetts, 231 U.S. 68, 34 S.Ct. 15, 58 L.Ed. 127; Kansas City, Fort Scott & Memphis Railway Co. v. Botkin, 240 U.S. 227, 36 S.Ct. 261, 60 L.Ed. 617; Cheney Bros. Co. v. Massachusetts, 246 U.S. 147, 38 S.Ct. 295, 62 L.Ed. 632. (Compare also: St. Louis Southwestern Railway Co. v. Arkansas, 235 U.S. 350, 35 S.Ct. 99, 59 L.Ed. 265; Air-Way Electric Appliance Corp. v. Day, 266 U.S. 71, 45 S.Ct. 12, 69 L.Ed. 169; Great Atlantic & Pacific Tea Co. v. Grosjean, 301 U.S. 412, 57 S.Ct. 772, 81 L.Ed. 1193, 112 A.L.R. 293; Ford Motor Co. v. Beauchamp, supra.)

[10]International Paper Co. v. Massachusetts, supra.

[11]Western Union Telegraph Co. v. Kansas, 216 U.S. 1, 30 S.Ct. 190, 54 L.Ed. 355; Pullman Co. v. Kansas, 216 U.S. 56, 30 S.Ct. 232, 54 L.Ed. 378; Ludwig v. Western Union Telegraph Co., 216 U.S. 146, 30 S.Ct. 280, 54 L.Ed. 423; Looney v. Crane Co., 245 U.S. 178, 38 S.Ct. 85, 62 L.Ed. 230; Cudahy Packing Co. v. Hinkle, 278 U.S. 460, 49 S.Ct. 204, 73 L.Ed. 454. As stated by Mr. Justice White in his concurring opinion in Western Union Telegraph Co. v. Kansas, the leading case on the subject: (30 S.Ct. 190, 207)

"[The rule simply prevents] the state from driving out the corporation which is in the state by imposing upon it arbitrary and unconstitutional conditions, when upon no possible theory could the right to exact them exist, except upon the assumption that the corporation is not in the state, and that the illegal exactions are the price of the privilege of allowing it to come in."

it may well be argued that in the case of a fee charged upon *increase* of authorized capital, it *is* charged upon the original entrance of the corporation in its new and more powerful form; that the corporation upon amendment of its articles becomes in effect a new corporation and that so long as the requirement of a fee existed at the time its articles were amended it, in effect, existed at the time of entrance and constitutes a true condition precedent of original entrance of the corporation in its new form.

Upon this argument, however, we regard the case of Cudahy Packing Co. v. Hinkle, 278 U.S. 460, 49 S.Ct. 204, 73 L.Ed. 454 (supra, footnote 11), as controlling. Factually, that case would appear to be on all fours with the case before us. The Cudahy Packing Company was admitted to do business in the State of Washington in 1916 when its authorized capital stock was $20,000,000. Subsequently its authorized capital was, by amendment of its articles, increased to $45,000,000. In 1925, Washington enacted a law requiring the filing by foreign corporations of all amendments to articles increasing authorized capital stock and the payment therefor of the same graduated fee payable upon the filing of original articles. Fees were demanded of the company which then brought suit for an injunction. In the United States supreme court the fee was held unconstitutional upon the authority of Looney v. Crane Co. (supra, footnote 11).

The action taken by the court in that case is clarified by the opinion in the Atlantic Refining Co. case (from which we have already quoted at length, supra, footnote 5). There it was stated: (82 L.Ed. 24, 31)

"The position of the company in the case at bar differs radically from that of the foreign corporation involved in Cudahy Packing Co. v. Hinkle, 278 U.S. 460, 73 L.Ed 454, 49 S.Ct. 204, Supra, and from those in the other decisions of this court on which appellant relies. In each of those cases the corporation had, *before the exaction held unconstitutional,* entered the state with its

permission to do local business and pursuant to that permission had acquired property and made other expenditures. Their property and the local business were found to be so closely associated with this interstate business done there that the exaction burdened it. The exaction, although called in some of those cases a filing fee, was in each case strictly a tax; for *it was imposed after the admittance of the corporation into the State. * * *"* [Emphasis supplied.]

It would, therefore, appear clear that for a charge reckoned upon total authorized capital stock (applied to a foreign corporation engaged in both local and interstate business) to avoid violation of the commerce and due process clauses it must have existed as a condition (either precedent or subsequent) of the corporation's original admission to the state. If the corporation's admission originally was free from such a condition, the condition may not be subsequently imposed. Even though the charge partake of all the characteristics of an entrance fee, its imposition under such circumstances does constitute a burden upon interstate commerce and a tax upon property beyond the boundaries of the state.

This conclusion can, we feel, be rationalized. The corporation, even with its changed characteristics and vastly increased power, remains the same person already granted entrance to the state. The local business there developed and the interstate business with which it has become connected are in the same hands, even though those hands may vastly have increased in strength. The state at the time of original entrance of the corporation imposed no conditions upon such change of characteristics although such conditions were within the right of the state to impose. Having, at the time of entrance, failed to impose such conditions, the corporation was admitted unconditionally and unequivocally in such respect.

Such are the circumstances in the case before us. The state at the time of relator's original admission imposed no requirement as to the filing of amendments to corporate articles of foreign corporations. This requirement, together with the fee imposed therefor, was enacted after the corporation's admission to the state. Such a condition to the engaging in local business imposed under these circumstances must be held to violate the commerce and due process clauses of the United States constitution and the fourteenth amendment.

It is ordered that the writ of mandate issue as prayed.

BADT, C. J., and EATHER, J., concur.