# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-12-00515-CV

**Susan Combs, Comptroller of Public Accounts of the State of Texas; and Greg Abbott, Attorney General of the State of Texas, Appellants**

**v.**

**Newpark Resources, Inc., Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT
### NO. D-1-GN-11-002205, HONORABLE TIM SULAK, JUDGE PRESIDING

## O P I N I O N

In this suit to recover franchise taxes paid under protest, appellants Susan Combs, Comptroller of Public Accounts for the State of Texas, and Greg Abbott, Attorney General of the State of Texas (collectively, the Comptroller), appeal from the trial court's final judgment in favor of appellee Newpark Resources, Inc. On appeal, the Comptroller asserts that the trial court erred in concluding that Newpark was entitled to a tax refund because (1) Newpark's subsidiary, Newpark Environmental Services, LLC (NES), did not qualify for a cost-of-goods-sold deduction and (2) Newpark was not entitled to exclude from its total revenue NES's payments to subcontractors. *See* Tex. Tax Code §§ 171.1011(g)(3), 171.1012. We affirm the trial court's judgment.

**BACKGROUND**

**Structure of the franchise tax**

Because this Court has not previously analyzed the most recent incarnation of Texas's franchise tax, we begin our discussion with a brief overview of the franchise tax. The franchise tax is a tax on the value and privilege of doing business in Texas. *See In re Nestle USA, Inc.*, 387 S.W.3d 610, 612 (Tex. 2012 ) (orig. proceeding). The tax was enacted in 1893 but has been significantly restructured several times. *See id.* at 612–13 (discussing history of franchise tax). The current version of the franchise tax is codified in chapter 171 of the Tax Code, which was adopted in 2006 as part of the legislature's "effort to provide lasting property tax relief, establish a stable and long-term source of funding for public schools, and meet the June 1, 2005 deadline set in *West Orange-Cove*." *In re Allcat Claims Serv., L.P.*, 356 S.W.3d 455, 458–59 (Tex. 2011) (orig. proceeding) (citing *Neeley v. West Orange-Cove Consol. Indep. Sch. Dist.*, 176 S.W.3d 746, 753–54 (Tex. 2005) (concluding that previous school-funding scheme was unconstitutional)). "The tax is still based primarily on revenue and only secondarily on capital, and now applies to every for-profit entity doing business or chartered in Texas that is distinct from its owners." *In re Nestle USA*, 387 S.W.3d at 614.

As the supreme court explained, the current franchise tax is generally calculated using the following formula:

Total Revenue

– General Deduction: the greater of either the Cost of Goods Sold, Compensation, or 30%

2

| | |
|---|---|
| = | Margin |
| x | Percentage of gross receipts from Texas business |
| = | Taxable Margin |
| x | Tax Rate (0.5% for entities primarily engaged in wholesale or retail trade, 1% for all others) |
| = | Franchise tax |

*Id.*

The calculation of total revenue is governed by section 171.1011 of the Tax Code. Generally, total revenue is "income reported to the federal IRS with various deductions, limitations, and exceptions." *See id.* at 615 (listing several exclusions from total revenue). The relevant revenue exclusion in this case is set out in section 171.1011(g)(3) and requires a taxable entity to exclude from total revenue all "flow-through funds that are mandated by contract to be distributed to" subcontractors that "provide services, labor, or materials in connection with" various improvements to real property.

After calculating total revenue, a taxable entity may take one of three general deductions: cost of goods sold, compensation, or 30% of total revenue. The cost-of-goods-sold deduction, which is the deduction Newpark elected to take in this case, is governed by section 171.1012 of the Tax Code. This provision allows a company to deduct "'all direct costs of acquiring or producing goods,' some indirect costs like insurance, utilities, and quality control, and up to 4% of other 'indirect or administrative overhead costs.'" *See id.* (quoting Tex. Tax Code § 171.1011(a)(1), (c)–(d), (f)).

3

Newpark and its subsidiaries are "[a]ffiliated entities engaged in a unitary business." *In re Nestle USA, Inc.*, 387 S.W.3d at 614; *see also* Tex. Tax Code § 171.1014. Therefore, Newpark files a single tax report for the combined group. The group must elect to take the same general deduction—meaning all members must take either a cost-of-goods-sold, compensation, or 30% deduction. *See* Tex. Tax Code § 171.1014(d). With this background in mind, we turn to the specific facts of this case.

**Factual and procedural background**

Newpark describes itself as an "integrated oilfield services company," providing services to third-party "exploration and production companies" that are necessary for the drilling of oil and gas wells. Newpark's primary business activity—at least with respect to the disputed issues in this case—involves the manufacture, sale, injection, and removal of "drilling mud."[1] Drilling mud is a product that is injected into a well hole as it is being drilled to cool and lubricate the drill as well as to facilitate the removal of rock, soil, and other "waste material" from the hole.

Newpark, as the parent company, uses several subsidiaries for its various drilling-mud operations. One subsidiary manufactures the industrial minerals that go into making drilling mud; another subsidiary produces, sells, injects, and removes the drilling mud from the well; and NES—the main subsidiary at issue in this appeal—removes the resulting nonhazardous waste materials from the drilling site, transports the waste to NES's underground disposal sites, and injects

---

[1] Newpark also provides other services to drilling operations, including manufacturing and renting "composite mats" and other "initial planning and drill-site-location and construction services." Although these other activities may be included in Newpark's overall revenue and, by extension, be subject to the franchise tax, they are generally not relevant to the issues in this appeal.

the waste into the sites for permanent disposal. NES hires subcontractors to operate the trucks and barges that haul waste to the disposal sites.

Newpark explained that its customers generally purchase Newpark's services as an "integrated service package" rather than separately from each subsidiary. Contracts are usually between the customer and Newpark and its "subsidiaries and affiliated companies unless expressly excluded by written agreement." These contracts generally do not specify what subcontractors, if any, Newpark or its subsidiaries will use to provide their services.

The Comptroller conducted a "desk audit" of Newpark's franchise-tax returns for 2008 and 2009 and asked Newpark to explain its subsidiaries' business activities. Newpark explained NES's business as outlined above, and based on that description, the Comptroller determined that Newpark owed an additional $186,547.03 for 2008 and $205,698.98 for 2009, plus penalties and interest. This adjustment was based on the Comptroller's determination that NES's disposal of waste material was a service that did not qualify for a cost-of-goods-sold deduction. Newpark paid the additional tax under protest and filed this underlying protest suit.

In its suit, Newpark asserted that it was entitled to include NES's expenses in Newpark's overall cost-of-goods-sold deduction. *See id.* § 171.1012. Alternatively, Newpark argued that it was entitled to exclude a nearly equivalent amount from its total revenue based on NES's flow-through payments to subcontractors for hauling the waste.[2] *See id.* § 171.1011(g)(3).

---

[2] As the statute makes clear, if a taxable entity excludes flow-through payments to subcontractors from its total revenue, it cannot claim those same payments in its cost-of-goods-sold deduction. *See* Tex. Tax Code § 171.1011(i). The value of Newpark's alleged exclusions and deductions are not in dispute, and NES's proposed cost-of-goods-sold deduction is slightly larger than its proposed flow-through revenue exclusion.

Newpark also claimed additional cost-of-goods-sold deductions for its various indirect and administrative overhead expenses that were not included in Newpark's original tax return. *See id.* § 171.1012(f).

Following a bench trial, the trial court rendered a final judgment in Newpark's favor, concluding that Newpark was entitled to a refund of $472,872, plus statutory interest. The Comptroller did not timely request, and the trial court did not issue, findings of fact and conclusions of law. However, to reach the amount of Newpark's refund, the trial court must have concluded that Newpark was entitled to claim NES's expenses—including its indirect and administrative overhead expenses—in Newpark's overall cost-of-goods-sold deduction. *See supra* n.2. This appeal followed.

**STANDARD OF REVIEW**

The trial court, acting as factfinder, is the sole judge of credibility of the witnesses and weight to be given to their testimony. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986). Where, as in this case, no findings of fact or conclusions of law are filed or requested, we must infer that the trial court made all findings necessary to support its judgment. *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 83 (Tex. 1992). When the implied findings of fact are supported by the evidence, we must affirm the trial court's judgment on any theory of law applicable to the case. *See In re W.E.R.*, 669 S.W.2d 716, 717 (Tex. 1984); *Carrollton-Farmers Branch Indep. Sch. Dist. v. JDP, Inc.*, 168 S.W.3d 184, 188 (Tex. App.—Dallas 2005, no pet.).

The issues in this case primarily concern the proper construction of chapter 171 of the Tax Code. *See generally* Tex. Tax Code §§ 171.1011–.1014. Statutory construction is a question of law that we review de novo. *See First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 631 (Tex.

2008). When construing a statute, our primary objective is to ascertain and give effect to the legislature's intent. *Id.* at 631–32. In determining legislative intent, we first consider the plain language of the statute. *GMC v. Bray*, 243 S.W.3d 678, 685 (Tex. App.—Austin 2007, no pet.). When statutory text is clear, it is determinative of legislative intent, unless enforcing the plain meaning of the statute's words would produce an absurd result. *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009). We consider the statute as a whole, reading each word in context rather than in isolation, and unless a different definition is supplied by the legislature, we assume the words chosen have their plain and ordinary meaning. *See City of Rockwell v. Hughes*, 246 S.W.3d 621, 625–26 (Tex. 2008). Our analysis is informed by the presumption that "the entire statute is intended to be effective" and that "a just and reasonable result is intended." *See* Tex. Gov't Code § 311.021(2), (3); *Shook v. Walden*, 304 S.W.3d 910, 917 (Tex. App.—Austin 2010, pet. denied). Only when the statutory text is ambiguous "do we resort to rules of construction or extrinsic aids."[3] *Shook*, 304 S.W.3d at 917 (internal quotations omitted); *see also Combs v. Metropolitan Life Ins. Co.*, 298 S.W.3d 793, 796–97 (Tex. App.—Austin 2009, pet. denied).

## DISCUSSION

The Comptroller raises four issues on appeal, which we group into the following two categories. First, the Comptroller asserts that NES provides only services, and therefore its expenses do not qualify for a cost-of-goods-sold deduction. Second, the Comptroller argues that NES's payments to its subcontractors do not constitute "flow-through funds" that can be excluded from

---

[3] The parties dispute whether the cost-of-goods-sold deduction is "an imposition of a tax rather than an exemption," which affects whether the tax is strictly construed in favor of or against the taxpayer. *See Upjohn Co. v. Rylander*, 38 S.W.3d 600, 606 (Tex. App.—Austin 2000, pet. denied). However, this rule of construction only applies if the statute is ambiguous. *See id.*

7

total revenue because Newpark's contracts with its customers did not require Newpark or NES to use those subcontractors.

The parties concede that if Newpark can include NES's expenses in its cost-of-goods-sold deduction, then the trial court's judgment in Newpark's favor must be affirmed regardless of whether Newpark can also exclude its flow-through payments from total revenue. *See supra* n.2. Therefore, we will address the cost-of-goods-sold issue first because it may be dispositive in this case.[4] *See Carrollton-Farmers Branch Indep. Sch. Dist.*, 168 S.W.3d at 188 (noting that appellate court will affirm trial court's determination of tax if correct on any legal theory presented); *see also* Tex. R. App. P. 47.1 (requiring appellate courts to hand down opinions that are as short as possible while addressing every issue necessary to disposition).

In its first, third, and fourth issues on appeal, the Comptroller challenges the trial court's determination of Newpark's overall cost-of-goods-sold deduction.[5] Specifically, the

---

[4] In addressing the cost-of-goods-sold-deduction issue first, we in no way suggest that the Comptroller or taxable entities are free to determine a general deduction before determining total revenue. However, in this case, the parties concede that if Newpark was entitled to take the cost-of-goods-sold deduction, the trial court's judgment must be affirmed. Therefore, although the cost-of-goods-sold deduction is not a stand-alone theory for determining franchise tax, in this specific case, it is a stand-alone theory for affirming the trial court's judgment. *See* Tex. R. App. P. 47.1 (requiring courts of appeals to hand down opinion that is as brief as practicable while addressing every issue necessary for final disposition).

[5] The Comptroller's first, third, and fourth issues relate to whether NES's direct expenses, administrative-overhead costs, and pollution-control costs qualify for the cost-of-goods-sold deduction. *See* Tex. Tax Code § 171.1012(c)(7), (f), (i). As the Comptroller concedes, if NES's direct expenses are deductible as a cost of goods sold, then NES may also deduct its administrative-overhead and pollution-control costs. As part of its fourth issue, the Comptroller also asserts that there is no evidence to substantiate how much Newpark spent on its pollution-control costs. Even assuming that this argument was not waived as inadequately briefed, *see* Tex. R. App. P. 38.1(i), we conclude that there is sufficient testimony and documentation in the record to support the trial court's valuation of NES's pollution-control costs.

Comptroller argues that because NES provides only services, it does not sell any goods for which it could claim a cost-of-goods-sold deduction. Therefore, according to the Comptroller, the trial court erred in including NES's expenses in Newpark's overall cost-of-goods-sold deduction.

As we will discuss, the resolution of this issue involves two separate questions. First, in determining cost of goods sold, do we consider each member of a combined group's business in the context of the combined group's business as a whole, rather than treating each member as if it were a stand-alone company? Second, does NES "furnish[] labor or materials to a project for the construction . . . of real property" such that it can include the cost of that labor or material in its cost of goods sold? *See* Tex. Tax Code 171.1012(i). Under the facts of this case, we answer yes to both questions, and therefore we affirm the trial court's implied finding that Newpark was entitled to include NES's expenses in its cost-of-goods-sold deduction.

**Do we consider NES's expenses in the context of Newpark's overall sales?**

In its brief, the Comptroller repeatedly emphasizes that NES does not sell any goods in the ordinary course of its business, and therefore it cannot qualify for any cost-of-goods-sold deduction. *See id.* § 171.1012(a)(1), (c)–(d) (defining "good" and listing several costs associated with production and sale of goods that can be deducted). According to Newpark, this argument underscores the fault in the Comptroller's analysis, in that the Comptroller incorrectly views NES as an isolated business rather than as a part of Newpark. The Comptroller's analysis, according to Newpark, is inconsistent with the plain language of the statute.[6]

---

[6] It is not entirely clear whether the Comptroller actually asserts that NES's activities must be viewed in isolation. In its brief, the Comptroller states that "an entity which would not be

9

We agree with Newpark that the plain language of the statute does not support the Comptroller's interpretation that section 171.1014(e)(1) requires each member's business to be viewed in isolation when determining the member's eligibility to take a cost-of-goods-sold deduction. Section 171.1014 generally governs when and how a combined group files a combined report, and subsection (e) delineates how the combined group calculates its cost-of-goods-sold deduction. This subsection states:

> For purposes of Section 171.101, a combined group that elects to subtract costs of goods sold shall determine the amount by:
>
> (1) *determining the cost of goods sold for each of its members* as provided by Section 171.1012 *as if the member were an individual taxable entity*;
>
> (2) adding the amounts of the cost of goods sold determined under Subdivision (1) together; and
>
> (3) subtracting from the amount determined under Subdivision (2) any cost of goods sold amounts paid from one member of the combined group to another member of the combined group, but only to the extent the corresponding item of total revenue was subtracted under Subsection (c)(3).

*Id.* § 171.1014(e) (emphasis added).

---

eligible for the Cost of Goods Sold deduction if it were an individual taxable entity must calculate its Cost of Goods Sold deduction as zero." This language could be read to support Newpark's argument that the Comptroller attempts to look at NES—and by extension all subsidiaries—as if it were a stand-alone business, completely separate from its parent company. However, the Comptroller also argues that the analysis would be the same even if NES were part of the subsidiary that sold drilling mud because NES's activities are still only services. Thus, it is unclear whether the Comptroller actually attempts to analyze NES in isolation. Nevertheless, because resolution of this issue is fundamental to our disposition of this case, we will address Newpark's argument that, when determining NES's cost-of-goods-sold deduction, NES's activities must be considered in the context of Newpark's overall business.

Subsection 171.1014(e) is an accounting mechanism that adds up each member's cost of goods sold while eliminating any "double counting" of intra-group sales or transfers. Given that this provision is effectively a procedural tool, it would be inconsistent to treat subsection 171.1014(e)(1) as an additional substantive limitation that would require each member's business activity to be viewed in complete isolation from the combined group. *Cf. Sergeant Enter., Inc. v. Strayhorn*, 112 S.W.3d 241, 249–50 (Tex. App.—Austin 2003, no pet.) (noting that procedural tax tools generally do not affect vested rights of what can be taxed).

This conclusion is directly supported by subsection 171.1014(d-1), which states that "[a] member of a combined group may claim as costs of goods sold those costs that qualify under Section 171.1012 if the goods for which the costs are incurred are owned by another member of the combined group." As this provision indicates, a member that does not sell any goods itself may nevertheless deduct as cost of goods sold those expenses it incurs to sell goods owned by another member of the combined group. It would be entirely inconsistent to treat individual members as isolated entities under subsection (e)(1) but nevertheless allow them to deduct their costs for selling goods that are owned by other members of the combined group.

Finally, the overall structure of section 171.1014 supports the conclusion that when determining the franchise tax of a combined group, we consider the group as whole, not each member in isolation. *See City of Rockwell*, 246 S.W.3d at 625–26 (noting that courts consider statute as a whole and read words in context, not in isolation). As subsection 171.1014(b) clearly states, a "combined group is a single taxable entity for purposes of the application of the [franchise tax]." Furthermore, subsection 171.1014(d) requires a combined group to choose to deduct either

11

cost of goods sold or compensation "for all its members," thereby indicating that the franchise tax is intended to apply to all members of a combined group as if they were a single taxpayer. *See also* Tex. Tax Code §§ 171.1014(h) (requiring members of combined group to use same accounting period for determining margin and apportionment), 171.1014(i) (making each member jointly and severally liable for tax owed by combined group). It would be inconsistent with this framework to consider a combined group as a single taxable entity, require each member to take the same general deduction, but nevertheless treat each member as an isolated entity for purposes of determining eligibility to take the cost-of-goods-sold deduction. *Compare id.* § 171.1014(b), (d)–(d-1), *with id.* § 171.1014(e)(1). This conclusion would lead to the absurd result that a company that had no subsidiaries could take all costs-of-goods-sold deductions allowable under section 171.1012, but if that same company created subsidiaries it could potentially lose substantial cost-of-goods-sold deductions because each subsidiary might not sell goods in the ordinary course of its business.

Therefore, reading section 171.1014 as a whole, we agree with Newpark that each member's cost-of-goods-sold deduction must be determined by considering the member's expenses in the context of the combined group's overall business. To the extent the Comptroller asserts that section 171.1014(e)(1) requires us to look at NES in complete isolation, that interpretation is inconsistent with the statute. Thus, under the plain language of section 171.1014, we determine NES's eligibility to take a cost-of-goods-sold deduction within the context of Newpark's overall business.

**Do NES's expenses qualify as costs of goods sold under section 171.1012(i)?**

In its primary argument on appeal, the Comptroller asserts that Newpark cannot include NES's expenses in its cost-of-goods-sold deduction. Specifically, the Comptroller claims

12

that NES's removal and disposal of waste material is a "service" within the meaning of section 171.1012, and therefore NES does not sell a good for which the cost-of-goods-sold deduction could apply. *See id.* § 171.1012(a)(3)(B)(i) (excluding "services" from definition of tangible personal property). In its response, Newpark asserts that NES furnishes labor to projects for the construction and improvement of real property, and therefore Newpark is entitled to take a cost-of-goods-sold deduction for these expenses under section 171.1012(i). We begin our analysis of this issue with a brief overview of the cost-of-goods-sold deduction, focusing on those sections relevant to this appeal.

For purposes of the cost-of-goods-sold deduction, a "good" is "real or tangible property sold in the ordinary course of business of a taxable entity." *Id.* § 171.1012(a)(1). "Tangible personal property" is further defined as "personal property that can be seen, weighed, measured, felt, or touched or that is perceptible to the senses in any other manner," as well as various films, sound recordings, and other forms of property not at issue in this case. *Id.* § 171.1012(a)(3)(A)(i)–(iii). However, "services" are specifically excluded from the definition of tangible personal property. *Id.* § 171.1012(a)(3)(B)(i)–(ii).

A taxable entity that elects to take the cost-of-goods-sold deduction may deduct "all direct costs of acquiring or producing the goods," including labor, materials, handling, depreciation, and other sunk costs related to production. *Id.* § 171.1012(c)–(d). A taxable entity may also deduct up to 4% of its indirect or administrative overhead costs—such as legal, security, and accounting services—provided that it can demonstrate those costs "are allocable to the acquisition or production of goods." *Id.* § 171.1012(f). However, a taxable entity generally cannot include costs related to the

13

actual sale of goods—such as distribution, advertising, rehandling, or bidding expenses—in its cost-of-goods-sold deduction. *See id.* § 171.1012(e).

Finally, subsection 171.1012(i) creates a restriction—and potential expansion—of which entities can take a cost-of-goods-sold deduction. It states, in relevant part:

> A taxable entity may make a subtraction under this section in relation to the cost of goods sold only if that entity owns the goods. . . . A taxable entity *furnishing labor or materials to a project* for the construction, improvement, remodeling, repair, or industrial maintenance . . . of real property is considered to be an owner of that labor or materials and may include the costs, *as allowed by this section*, in the computation of cost of goods sold.

*Id.* § 171.1012(i) (emphasis added). With this statutory framework in mind, we now consider the facts of this case.

Newpark concedes that NES's disposal of waste does not qualify as either real or tangible personal property, and thus NES itself does not sell a "good" within the meaning of the franchise tax. *See id.* § 171.1012(a)(1). However, as discussed above, we do not consider NES in isolation, but rather determine whether NES's expenses qualify as a deductible cost of selling some Newpark good. *See id.* § 171.1014(d-1). Within that context, Newpark asserts that NES's expenses are part of the overall labor and materials that Newpark furnishes to the drilling of oil and gas wells, which the Comptroller does not dispute constitutes a project for the construction and improvement of real property. *See id.* § 171.1012(i). Based on the record, it appears that NES's expenses do not fit into any of the specified costs that can be deducted under subsections (c), (d),

14

or (f).[7]  Therefore, if NES's expenses qualify for a cost-of-goods-sold deduction, they must qualify under section 171.1012(i).

The Comptroller asserts that NES's removal and disposal of drilling mud is purely a service and does not constitute labor furnished to a project for the construction or improvement of real property.  The terms "labor" and "service" are not defined in chapter 171 or in the Tax Code.  Nevertheless, the Comptroller contends that the terms must have different meanings because section 171.1011(g)(3) lists "services" and "labor" as separate activities that can be related to the improvement of real property.  *See id.* § 171.1011(g)(3) (noting that taxpayer may exclude flow-through payments for "services, labor, or materials in connection with . . . design, construction, remodeling . . . on real property").  This use of separate terms, according to the Comptroller, indicates that the legislature understood services to mean something distinct from labor with respect to the construction of real property.

Although we agree that the separate listing of services and labor in section 171.1011(g)(3) indicates that they encompass different concepts, the fact that the terms are listed separately does not mean they are mutually exclusive.  *See Matagorda Cnty. Appraisal Dist. v. Coastal Liquids Partners, L.P.*, 165 S.W.3d 329, 334–35 (Tex. 2005) (noting that categories listed separately in statute can still overlap).  Furthermore, the fact that section 171.1011(g)(3) indicates that labor and services have distinct meanings does not provide us with clear guidance as to what

_____

[7] The removal and disposal of waste from the drilling site is not an aspect of the acquisition or production of drilling mud, nor is it a result of deterioration, spoilage, or other sunk cost associated with the production of drilling mud.  *See* Tex. Tax Code § 171.1012(c)–(d).  In addition, NES's removal and disposal of waste does not constitute an indirect or administrative overhead cost of producing a good.  *See id.* § 171.1012(f).

15

that distinction is. Neither term is defined in the statute, and the ordinary definitions of labor and services substantially overlap such that both definitions tend to refer to the words interchangeably.[8] *See City of Rockwell*, 246 S.W.3d at 625–26 (noting that courts assume undefined terms have ordinary meaning). Webster's Dictionary does offer one arguably pertinent definition of services, explaining it to mean "useful labor that does not produce a tangible commodity," noting that "railroads, telephone companies, and physicians perform services although they produce no goods." *See* Webster's Third New International Dictionary 2075 (Phillip Gove Ed. 2002). However, even assuming we could reconcile that definition with section 171.1011(g)(3)'s reference to "services . . . in connection with the actual or proposed design, construction, . . . of real property," the same question still remains—does NES furnish "labor" to a project for the construction of real property? In order to answer that question, we must determine section 171.1012(i)'s function.

*Function of section 171.1012(i)*

The function of section 171.1012(i) must be determined within the context of the section 171.1012 generally. *See City of Rockwell*, 246 S.W.3d at 625–26 (noting that courts consider entire statute and put words in context). We will primarily consider the consequences of the various proposed constructions, presuming that the legislature intended the entire statute to be effective and to achieve "a just and reasonable result." *See* Tex. Gov't Code §§ 311.021(3), 311.023(5).

---

[8] Webster's defines "labor" as the "expenditure of physical or mental effort especially when fatiguing, difficult, or compulsory," while "service" is defined as "the performance of work commanded or paid for by another." *See* Webster's Third New International Dictionary 1259, 2075 (Phillip Gove Ed. 2002). Thus, both labor and services are generally work done for another, with labor potentially including an additional expenditure of either physical or mental effort.

16

Generally, section 171.1012(i) operates as a broad limitation on which entities can claim the cost-of-goods-sold deduction, restricting it to those that actually own the goods they sell. *See* Tex. Tax Code § 171.1012(i). However, the section then provides a general exception to this rule—stating that those that furnish labor or materials to certain projects related to real property are "considered to be an owner of that labor or materials and may include the costs, *as allowed by this section*, in the computation of cost of goods sold." *See id.* (emphasis added). It is not entirely clear from the structure of this subsection what the legislature was trying to accomplish. Did it mean that, in the context of improving real property, a party furnishing labor does not need to sell a separate good to qualify for the cost-of-goods-sold deduction? If so, can those entities that furnish labor to the improvement of real property deduct all expenses related to their supply of labor as a cost of goods sold? Can multiple taxpayers qualify as furnishing the same labor, thereby allowing multiple deductions for the same expense?

The Comptroller asserts that "[t]he purpose of Section 171.1012(i) is to allow construction companies and contractors . . . to act like they are the owner of those materials and labor." Otherwise, the Comptroller notes, "construction companies and contractors could not take the Cost of Goods Sold deduction because they do not own the finished product." Although this is merely a litigation position and not a formal interpretation, it is generally consistent with Newpark's explanation of the statute and a common-sense understanding that many contractors and subcontractors that improve or maintain real property do not actually own or sell the property. Given that real property itself is a "good" within the meaning of section 171.1012, but that many of the businesses that incur costs to improve or maintain real property never sell that good, the legislature

17

could have reasonably intended section 171.1012(i) to allow those same companies to deduct their costs as if they were a cost of goods sold.

Otherwise, section 171.1012(i)'s provision making the party that furnishes labor the "owner" of that labor would be meaningless because, regardless of whether a contractor owned the labor it supplied, the contractor could not deduct the cost of supplying that labor unless it also sold the real property or some other tangible personal property in the ordinary course of its business. *See* Tex. Tax Code § 171.1012(i); *see also* Tex. Gov't Code § 311.021(2) (noting that courts presume entire statute intended to be effective). Furthermore, it would make the classification of real property as a good relatively ineffectual because a potentially large percentage of taxable entities that incur costs to develop or maintain real property would never be able to deduct those costs as a cost of goods sold. Therefore, we conclude that when viewed in the context of section 171.1012, subsection (i) means that the party that supplies labor or materials to the construction, improvement, remodeling, repair, or industrial maintenance of real property can deduct its labor or material expenses as a cost of goods sold, assuming those expenses would qualify as the cost of selling real property. *See* Tex. Tax Code § 171.1012(i) (permitting deduction of labor and materials costs "as allowed by this section"). Having determined the function of section 171.1012(i), we can more accurately determine what constitutes labor furnished for the improvement of real property.

*Meaning of "labor" within the context of section 171.1012*

Given our conclusion that section 171.1012(i) is designed to allow the party that furnishes labor for the improvement of real property to deduct that cost as if it sold the property,

18

there is no reason to believe that "labor" under subsection 171.1012(i) means anything different than labor under section 171.1012 generally. *See Sheshunoff v. Sheshunoff*, 172 S.W.3d 686, 692 (Tex. App.—Austin 2005, pet. denied) (noting that courts presume that same terms used in same connection in different statutes have same meaning). Generally, a taxable entity may deduct "all direct costs of acquiring or producing" goods, including "labor costs." *See* Tex. Tax Code § 171.1012(c)(1).

"Labor" is a broad term that encompasses a wide range of activities, including "expenditure of physical or mental effort especially when fatiguing, difficult, or compulsory." Webster's Third New International Dictionary 1259, 2075 (Phillip Gove Ed. 2002). None of the surrounding statutory text indicates that labor has a more limited meaning than its common definition. *Cf. Railroad Comm'n of Tex. v. Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 628 (Tex. 2011) ("[W]e have warned against expansively interpreting broad language where it is immediately preceded by narrow and specific terms."). Therefore, we presume that the legislature intended to allow taxable entities to deduct a wide range of labor expenses.[9] *See Texas Dep't Pub. Safety v. Abbott*, 310 S.W.3d 670, 675 (Tex. App.—Austin 2010, no pet.) (noting courts assume broad statutory terms have broad meaning).

---

[9] Because "labor" within the context of section 171.1012(i) can be given a clear and definite meaning based solely on the plain language of the statute, we conclude that the statute is not ambiguous. *See Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2008). Therefore, we do not reach whether the cost-of-goods-sold deduction operates as an imposition of a tax rather than a tax exemption. *See Upjohn Co. v. Rylander*, 38 S.W.3d 600, 606 (Tex. App.—Austin 2000, pet. denied) (noting that these presumptions only considered when tax statute is ambiguous). Similarly, we need not defer to the Comptroller's interpretation of the statute. *Id.*

We look to the facts of this case to determine whether NES's services, put in the context of Newpark's overall services, qualify as labor for the construction or improvement of real property. It is undisputed that the drilling and construction of oil and gas wells qualifies as construction or improvement to real property. Furthermore, it is undisputed that the injection and removal of drilling mud qualifies as labor and materials that are furnished for the construction of oil and gas wells. Therefore, the only question is whether NES's subsequent transport and disposal of the used drilling mud and other waste material is part of the labor involved in the drilling process.

The Comptroller asserts that NES's activities are akin to a garbage collector that picks up trash cans on the street corner and transports the trash to the local landfill. These activities, according to the Comptroller, are clearly a service and not labor supplied for the improvement of real property. While the Comptroller's hypothetical may be true as far as it goes, it seems that Newpark's activity in the record before us is more analogous to a demolition company that tears down a preexisting structure and then removes the resulting debris so that new construction can begin. It would be irrational to conclude that the demolition of the old structure is labor furnished for the construction or improvement of real property but that the actual removal and disposal of the resulting debris is a service that is not part of the construction process. After all, demolition without disposal would be pointless in this situation.

Similarly, it is difficult to view NES's disposal of waste material as though it were not an essential and direct component of the drilling process. Given that similar costs for scrap material and pollution control devices are deductible as costs of producing tangible personal property, it follows that such expenses should also be deductible for the improvement or maintenance of real

20

property.  *See* Tex. Tax Code § 171.1012(c)(7)–(8), (d)(3).  There was testimony at trial that the waste material was an inescapable byproduct of drilling, that removal and disposal of this waste material was essential to continue drilling, and that without this disposal the drilling process would come to an immediate halt.  Based on this testimony, the trial court could have reasonably concluded that the removal and disposal of this waste material was labor furnished to a project for the construction and improvement of real property.

Admittedly, other cases may present a close issue as to when labor is too far removed from the construction, improvement, remodeling, repair, or industrial maintenance of real property to qualify for the cost-of-goods-sold deduction under section 171.1012(i).  In this case, however, we conclude that the record supports the trial court's implied finding that NES furnishes labor to a project for the construction or improvement of real property.  Therefore, the trial court did not err in including NES's expenses within Newpark's overall cost-of-goods-sold deduction.  We overrule the Comptroller's first, third, and fourth appellate issues.

**CONCLUSION**

Having concluded that Newpark was entitled to include NES's expenses in its overall cost-of-goods-sold deduction, we need not determine whether Newpark could also exclude flow-through payments to subcontractors from NES's total revenue.  *See Carrollton-Farmers Branch Indep. Sch. Dist.*, 168 S.W.3d at188 (noting that appellate courts affirm trial court's determination of tax if correct on any legal theory presented); *see also* Tex. R. App. P. 47.1.  We affirm the judgment of the trial court.

21

_____

Scott K. Field, Justice

Before Chief Justice Jones, Justices Pemberton and Field
  Concurring Opinion by Chief Justice Jones

Affirmed

Filed:   December 31, 2013