# Supreme Court of Texas

No. 20-0462

Sirius XM Radio, Inc.,

*Petitioner*,

v.

Glenn Hegar, Comptroller of Public Accounts and Ken Paxton,
Attorney General of the State of Texas,

*Respondents*

On Petition for Review from the
Court of Appeals for the Third District of Texas

**Argued November 30, 2021**

JUSTICE BLACKLOCK delivered the opinion of the Court.

Sirius XM Radio produces radio programming, which it transmits using satellites. Subscribers pay monthly fees to access Sirius's programming. To calculate the franchise tax it owes to the State of Texas, Sirius must first calculate its "receipts from . . . each service performed in this state." TEX. TAX CODE § 171.103(a). The principal question before this Court is whether Sirius's monthly subscription fees from Texas users are receipts from a "service performed in this state."

Sirius argues that the service it performs for its Texas subscribers is the production of radio shows and the transmission of a radio signal, nearly all of which takes place outside Texas. According to Sirius, a service is "performed in this state" if the people or equipment performing the service are physically located in Texas. The Comptroller disagrees. It argues that the service Sirius performs for its Texas subscribers is the provision of access to its encrypted radio signal, which takes place on each subscriber's radio in Texas. The Comptroller reads the Tax Code to allocate services to Texas if the "receipt-producing, end-product act" takes place in this state. Here, the Comptroller contends, the "receipt-producing, end-product act" is the enabling of each subscriber's radio to receive Sirius's signal.

As explained below, we agree with Sirius. We therefore reverse the judgment of the court of appeals and remand the case to that court for consideration of the parties' remaining arguments.

## I

## A

Texas's franchise tax is calculated by multiplying the taxable entity's "taxable margin" by the tax rate. TEX. TAX CODE § 171.002. Determining an entity's "taxable margin" requires three steps: margin calculation, apportionment, and deductions. *Id.* § 171.101(a). Entities first calculate their "margin," which is generally a percentage of their total revenue. *Id.* § 171.101(a)(1). The next step is "apportioning the taxable entity's margin to this state as provided by Section 171.106." *Id.* § 171.101(a)(2). This step yields the "apportioned margin." *Id.* The apportioned margin is calculated by multiplying the margin by a

2

fraction, whose "numerator . . . is the taxable entity's gross receipts from business done in this state" and whose "denominator . . . is the taxable entity's gross receipts from its entire business." *Id.* § 171.106(a). Finally, subtracting allowable deductions from the apportioned margin yields the entity's "taxable margin," to which the tax rate is applied. *Id.* § 171.101(a)(3).

Only the second step—apportionment to Texas—is at issue here. Determining the apportioned margin requires calculating what percentage of the entity's gross receipts are "from business done in this state." *Id.* § 171.106(a). Section 171.103 describes the required calculation. The only element of the calculation in dispute is "the taxable entity's receipts from . . . each service performed in this state." *Id.* § 171.103(a)(2). The parties' principal disagreement is whether Sirius's receipts from subscriber fees paid by Texas customers are "from . . . service performed in this state." *Id.*

The Tax Code authorizes the Comptroller to adopt lawful rules for "the collection of taxes and other revenues under this title," which includes Chapter 171. *Id.* § 111.002. The administrative rules applicable to this case provided that receipts from services "are apportioned to the location where the service is performed," and if services are performed in more than one state, then the value apportioned to Texas is the "fair value of the services that are rendered in Texas." 32 Tex. Reg. 10044, 10047 (2007), *amended in part by* 46 Tex. Reg. 460 (2021) [hereinafter former 34 TEX. ADMIN. CODE § 3.591(e)(26)].

3

## B

Sirius broadcasts more than 150 satellite-radio channels, over 70% of which run exclusively original content produced by Sirius. The content is produced in studios mainly located in New York City and Washington, D.C., although Sirius ran a small radio show in Texas for a time. Content is broadcast by transmitting it to satellites from uplink facilities in New Jersey, D.C., and Georgia. The satellites are launched from Kazakhstan. Sirius has ten satellites orbiting 22,000 miles above the earth. They transmit the signals they receive back down to Earth, where they either reach radio sets or, in densely populated areas, one of Sirius's seven hundred terrestrial repeaters (twenty-two of which are in Texas) that supplement its satellite coverage. The satellites are controlled by Sirius's facilities in Panama, Ecuador, and Georgia.[1] Once the signal reaches a customer's radio, a "chip set"—that is, a pair of integrated circuits—decrypts the radio signal, allowing the listener to hear the programming.

Customers can access Sirius's content by purchasing one of Sirius's radio sets and paying a subscription fee. Sirius has agreements with auto makers to ensure that new vehicles have Sirius-enabled radios installed. Subscribers typically purchase or lease vehicles with the radios installed rather than purchasing and installing their own. Each subscription is tied to one radio set. When a customer pays a subscription fee, Sirius sends a signal from New York or D.C. that activates the chip set in the satellite radio, which permits the chip set to

---

[1] The state, not the country.

4

decrypt radio signals. In many cases, new automobiles come with an active Sirius radio set, so Sirius sends a signal to deactivate and thereby encrypt the radio signal only if the purchaser fails to renew the subscription after his trial period ends.

Subscription fees are the primary source of Sirius's revenue. The chip set, which is equipped with technology to receive the activation signal and decrypt radio signals, is located in the radio set, but—save for a small number of terrestrial repeaters servicing a limited area—none of the equipment or personnel used to send activation signals to initiate decryption is located in Texas. Sirius creates content in various states, but very little of it is made in Texas.[2] It has many subscribers in Texas.

In 2009 and 2010, Sirius paid franchise taxes in Texas. Those tax years are at issue here. In calculating its margin, Sirius was permitted to deduct from its revenue the "cost of goods sold" (COGS). TEX. TAX CODE § 171.1012. Sirius included in that deduction certain revenue-sharing payments and subsidies it paid to automobile manufacturers to have its radios installed in vehicles. Sirius then apportioned its reported subscription receipts for each year based on the locations where it produced its programming and on the relative costs of those activities in Texas and elsewhere.

The Comptroller's Office audited Sirius. It determined that Sirius should apportion based on the location of its subscribers, not based on the location where its programs are produced. The Comptroller

---

[2] Sirius produced a channel called "Willie's Place" in Hillsboro, Texas. Taxation of that production is not at issue.

5

claimed Sirius underpaid by $878,364.39 for the 2010 tax year and $1,674,907.38 for the 2011 tax year. According to the Comptroller, the "service performed in this state" by Sirius was the service of "unscrambling" the radio signal. The Comptroller reached this conclusion based on its position that services must be apportioned to the state in which the "receipt-producing, end-product act" takes place. Additionally, in the Comptroller's view, Sirius could not take a COGS deduction for the revenue-sharing and subsidy agreements because they did not qualify as "direct costs of acquiring or producing the goods." TEX. TAX CODE § 171.1012(c).

Sirius paid the assessed tax under protest, *id.* § 112.052, and sued in district court in Travis County for a refund. Sirius did not dispute that it performed a small amount of services in Texas, but it claimed that the vast majority of its work in producing and broadcasting content was performed elsewhere. The district court found that Sirius's "receipt-producing, end-product act" was producing and broadcasting its content over satellite radio, not decrypting radio signals. It held that Sirius performed this service both inside and outside of Texas and that its receipts must therefore be apportioned to Texas based on the fair value of the service performed in Texas. The court heard expert testimony from Sirius, which included a cost study to determine the fair value of its services performed in Texas. The court found this analysis to be a credible method for determining fair value. The Comptroller did not provide an opposing calculation on the fair-value question or offer any of its own witnesses, instead arguing that the burden of proof was

6

on Sirius. The Comptroller maintained that Sirius's cost of performance was not valid evidence of fair value.

The district court found that Sirius performed its services almost exclusively outside Texas. It apportioned to Texas only 0.47% and 0.26% of Sirius's total receipts from the two years in question, whereas the Comptroller would have apportioned 8.3% and 8.36%, respectively. The court rendered judgment for Sirius and ordered the Comptroller to refund over $2 million to Sirius. The court affirmed the Comptroller's denial of the disputed COGS deduction.

The Comptroller appealed the apportionment issue, and Sirius filed a conditional cross-appeal concerning the COGS deduction. The court of appeals reversed and rendered a take-nothing judgment against Sirius. Agreeing with the Comptroller's position that the phrase "service performed in this state" in Section 171.103(a)(2) refers to the "receipt-producing, end-product act," the court of appeals held that the service performed by Sirius for Texas subscribers was unscrambling the radio signal. 604 S.W.3d 125, 132–33 (Tex. App.—Austin 2020). The court thus agreed with the Comptroller on how to apportion Sirius's receipts to Texas. The court then held that the comparative cost of Sirius's activities inside and outside of Texas was not credible evidence of fair value under its understanding of how to apportion Sirius's receipts. *Id.* at 135. The court of appeals also affirmed the district court's judgment regarding Sirius's claimed COGS deduction. *Id.* at 137.

Sirius petitioned for review. It challenges only the court of appeals' holding that its receipts from Texas subscribers should be apportioned to Texas.

## II

### A

The parties' disagreement is largely one of statutory interpretation. The correct interpretation of a statute is a matter of law, which we review *de novo*. *Youngkin v. Hines*, 546 S.W.3d 675, 680 (Tex. 2018).[3]

The parties also raise arguments concerning judicial deference to a state agency's interpretations of statutes. Texas courts have not adopted the agency-deference doctrines employed by federal courts. *R.R. Comm'n v. Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 625 (Tex. 2011). Instead, this Court has said that "we will generally uphold an agency's interpretation of a statute it is charged by the Legislature with enforcing, so long as the construction is reasonable and does not contradict the plain language of the statute." *Id.* (cleaned up). Of course, a court must always endeavor to decide for itself what the statutory text means so that it can determine whether the agency's construction contradicts the statute's plain language. *Tex. Comm'n on Env't Quality v. Maverick County*, ___ S.W.3d ___, 2022 WL 413939, at *4 (Tex. Feb. 11, 2022).

---

[3] As always, the classic rules of statutory interpretation apply. *See, e.g.*, *KMS Retail Rowlett, LP v. City of Rowlett*, 593 S.W.3d 175, 183 (Tex. 2019) ("When interpreting statutes, we look to the plain meaning of the enacted text."); *Crosstex Energy Servs., L.P. v. Pro Plus, Inc.*, 430 S.W.3d 384, 389 (Tex. 2014) ("If the statute is clear and unambiguous, we must read the language according to its common meaning" without consulting "extrinsic aids."); *Tex. Mut. Ins. Co. v. Ruttiger*, 381 S.W.3d 430, 452 (Tex. 2012) ("[T]his Court presumes the Legislature deliberately and purposefully selects words and phrases it enacts, as well as deliberately and purposefully omits words and phrases it does not enact.").

The primary issue before this Court is whether Sirius's receipts from Texas subscribers are receipts from a "service performed in this state." TEX. TAX CODE § 171.103(a)(2).

Sirius argues that it performs little or no services in Texas. In its view, the phrase "service performed in this state" means that the personnel or equipment performing the service must be physically located in Texas. Sirius contends that the service it performs is not the decryption of radio signals but the production and broadcasting of radio content, which happens outside Texas.

The Comptroller agrees that the proper test is the location where the service is performed, not the location where the service is received. But it contends that Sirius's subscribers pay for decryption services in order to access the broadcasted content and that Sirius performs this service where the technology within the radio set is located. Therefore, the Comptroller concludes, the value must be apportioned to Texas, which is the location of the "receipt-producing, end-product act" of unscrambling the radio signal.

Again, the Tax Code requires apportionment based on whether receipts are from a "service performed in this state." *Id.* § 171.103(a)(2). But how does a court determine what a "service" is and where it is "performed"? This is not the first case to raise such questions. We have previously understood "service" to mean "performance of labor for the benefit of another." *Van Zandt v. Fort Worth Press*, 359 S.W.2d 893, 895 (Tex. 1962); *see also Combs v. Newpark Res., Inc.*, 422 S.W.3d 46, 54 (Tex. App.—Austin 2013, no pet.) (noting that "service" is "useful labor that does not produce a tangible commodity"). As for "performed in this

9

state," we have previously looked to whether the "act done" is "located in Texas." *Humble Oil & Refin. Co. v. Calvert*, 414 S.W.2d 172, 180 (Tex. 1967). We see no reason to depart from these straightforward understandings of the everyday words the statute uses. A "service" is "performed in this state" if the labor for the benefit of another is done in Texas.

Generally, all it takes to know where a taxable entity's "useful labor" is "done" is to ask where the employees do their work, since businesses act only through their agents. When technology rather than personnel performs the useful act, we look to the location of that equipment, as the Comptroller and courts of appeals have done. Hearing No. 10,028, 1980 WL 5466, at *5 (Tex. Cptr. Pub. Accts. Nov. 27, 1980) (looking to the "point of transmission" from broadcasting equipment); *Westcott Commc'ns, Inc. v. Strayhorn*, 104 S.W.3d 141, 147 (Tex. App.—Austin 2003, pet. denied) (looking to the location of "employees" and "facilities").

We reject the contrary inference that the Legislature, by choosing the passive voice—"performed in this state"—meant for us to ignore the location of the service *performer* and focus only on the location where the performance is received or its effects felt. The Legislature could have easily designated the place of receipt or the location of the customer as the site of taxation. In fact, the Legislature did so in the immediately preceding provision, which calls for apportionment based on "each sale of tangible personal property *if the property is delivered or shipped to a buyer in this* state." TEX. TAX CODE § 171.103(a)(1) (emphasis added).

10

In its original context in an administrative hearing decision, the "receipt-producing, end-product act" test advanced by the Comptroller is not to the contrary.[4] It served only to distinguish between the "support services" that enable the entity to do business and the "receipt-producing" services for which a customer actually pays. As originally employed, the test aimed to tell the Comptroller *what* qualifies as the "service performed." It did not tell the Comptroller *where* a service is performed.

Here, however, the Comptroller would use the "receipt-producing, end-product act" test to determine the *location* of the service. If pressed into this role, the test is not consistent with the statute. Mechanical application of the test would often require courts to focus on the location where the service is received. But the Legislature chose the word "performed"—not "received"—and any test that blurs this critical distinction parts ways with the statute.

The focus should be on the statutory words themselves, not on extraneous concepts like "receipt-producing" or "end-product act," which do not appear in the statute and, when applied, may or may not yield the same result as a straightforward application of the words chosen by

---

[4] On a fair reading of the administrative decision that first announced the "receipt-producing, end-product act" test, the test was mainly an afterthought, a way of distinguishing the administrative law judge's decision from related decisions in New York. Hearing No. 10,028, 1980 WL 5466, at *7. It comes only after the ALJ rejected a "location of the audience test" and held that taxation should be based on the "point of transmission." *Id.* at *5. As originally articulated, the "receipt-producing, end-product act" test was a way to distinguish a service-receipt system from a property-and-payroll system by focusing on the receipt derived from the service contracted for, not the other acts the company pays its staff to do elsewhere (i.e., support services).

11

the Legislature.  That is not to say the statutory text is always easy to apply.  It is not.  But it should not be replaced by words of limitation or expansion not chosen by the Legislature.  Setting aside the atextual and unhelpful "receipt-producing, end-product act" test, the most natural reading of "service performed in this state" supports locating the performance of the service at the place where the taxpayer's personnel or equipment is physically doing useful work for the customer.

**B**

What the text suggests, past precedent confirms.  Apportionment goes back to at least 1959, when the predecessor to the present statute was adopted.  Act of July 30, 1959, 56th Leg., 3d C.S., ch. 1, § 1, 1959 Tex. Gen. Laws 187.  The 1959 statute itself was merely a "codification of long-standing departmental practices." *Humble Oil & Refin. Co.*, 414 S.W.2d at 180.  In general, the taxes many states impose on service businesses can be sorted into "origin-based" and "destination-based" varieties, or those that look to where the service originates versus those that look to where it is received.  *See* JEROME R. HELLERSTEIN ET AL., STATE TAXATION ¶¶ 9.18[3], 9.18[3][a] (3d ed. 2011).[5]  The district court here held—and neither party contests—that Texas uses an origin-based system.  This means that Texas has long looked to where the service is performed rather than where it is received.  Going back to 1919, when

_____

[5] The Uniform Division of Income for Tax Purposes Act, which many states adopted, also demonstrates the important distinction between taxation based on where the income-producing activity occurs and where the market for the sale is.  Br. of Amici Council on State Tax'n and Tex. Taxpayers & Rsch. Ass'n at 7 n.2, 8 n.3.  The Comptroller's 1980 decision, on which it places great weight, also affirms the distinction.  Hearing No. 10,028, 1980 WL 5466, at *4.

Texas revised its franchise tax after the predecessor version was held unconstitutional by the United States Supreme Court, *see Looney v. Crane Co.*, 245 U.S. 178, 191 (1917), Texas has used a single-factor test based on sales receipts. Other states consider other factors in addition to receipts. *See, e.g.*, LA. STAT. ANN. § 47:606; OHIO REV. CODE § 5733.056. But Texas's single-factor, origin-based system looks only to where the service from which the receipts are derived is performed.

The case law applying an origin-based approach to the taxation of services comparable to Sirius's aids our inquiry. In *Southwestern Bell Telephone Co. v. Combs*, the court of appeals focused on the location of the "network, facilities, and/or personnel" of a telephone company. 270 S.W.3d 249, 262 (Tex. App.—Amarillo 2008, pet. denied). There, the taxpayer charged consumers for access to its local telephone network in order to complete long-distance calls. *Id.* at 257. The Comptroller's rules looked to whether there was "equipment located in Texas" to determine whether the service was performed in Texas. *Id.* at 261. And the court held that the services were performed in Texas because the network and facilities from which the taxpayer's personnel performed the service were located in Texas. *Id.* at 262.

Likewise, the court of appeals in *Westcott Communications, Inc. v. Strayhorn*, citing the "longstanding interpretation" of the Comptroller, looked to the location of Westcott's employees and of the facilities from which Westcott transmitted its satellite broadcasts. 104 S.W.3d at 146–47. In that case, customers contracted with Westcott to provide informational and training services that Westcott would broadcast over satellite to its customers. *Id.* at 144–45. The court

required Westcott to be taxed based on the location of its "broadcast transmission equipment" and "production facilities." *Id.* at 145. The court rejected Westcott's argument that "its services were performed where its subscribers were located" or "where the customers *received* the service." *Id.* Instead, it held for the Comptroller on the grounds that Westcott's service was the provision of training, which it did through personnel, facilities, and equipment located in Texas.[6] *Id.* at 147.

Even the administrative decision that first announced the Comptroller's "receipt-producing, end-product act" test focused on the place from which the broadcaster transmitted its signals through its equipment. Hearing No. 10,028, 1980 WL 5466, at *5. The taxpayer was a television broadcaster using equipment in both Texas and New Mexico. *Id.* at *1. The administrative law judge held that the company could be taxed on its transmissions from its Texas radio tower but not its New Mexico tower. *Id.* at *5. The decision concluded, "The primary thrust of this ruling is its recognition that revenue from broadcasting represents receipts from a service that is performed at the *point of transmission*, regardless of whether the broadcast waves traverse

---

[6] Although the governing statutory text has not materially changed, the arguments made by the Comptroller in *Westcott* before the ALJ were functionally the opposite of the Comptroller's position now. Hearing No. 35,481, 1998 WL 877860, at *4, *8 (Tex. Cptr. Pub. Accts. July 29, 1998) ("The Tax Division's arguments are readily summarized as follows: . . . (2) The services are performed at the place where Petitioner's employees who perform the services are located . . . . The Tax Division takes the position that delivery of electronic impulses is not determinative because services are apportioned where performed rather than where delivered.").

14

another state's airspace." *Id.* In other words, where the taxpayer's equipment emits the signal was the relevant location of performance.[7]

In sum, precedent confirms our reading of the Tax Code: Determining the location of performance requires looking to the physical location of the taxpayer's personnel or equipment that performs the service for which the customer pays. By contrast, we see no indication that the "receipt-producing, end-product act" test advanced by the Comptroller is well-established in prior case law. Oblique references to it exist. *See Westcott*, 104 S.W.3d at 146–47. But it has never been used to determine where a service is performed, at least not by courts. Even the administrative decision from which it derives did not apply it as the Comptroller now attempts to do. We see no reason for the "receipt-producing, end-product act" test to play any role in our decision.

### C

We turn now to the nature and location of the services performed by Sirius. The court of appeals held that the act "that allowed each Sirius XM customer to receive Sirius XM programming occurred when Sirius XM decrypted the program by activating or deactivating the customer's chip set in their satellite-enabled radio, which Sirius XM

---

[7] This was also the stance initially taken by the Comptroller's Office in a Letter Ruling provided to Sirius in 2008, which was subsequently superseded. *See* Tex. Cptr. Pub. Accts., Letter Ruling No. 200806626L (2008), https://star.comptroller.texas.gov/view/200806626L (2008) (superseded on other grounds) ("Subscription revenue is considered receipts from the performance of a service and should be apportioned to the location where the service is performed, which is the point of transmission. Therefore, to the extent all broadcasting occurs at the Company's facilities located outside of Texas, the subscription revenue should not be included in Texas gross receipts.").

could do remotely." 604 S.W.3d at 133. It concluded, "This act occurred where the satellite-enabled radio was located."[8] *Id.* In the court of appeals' view, "Sirius XM was not paid by its subscribers . . . to broadcast or produce television or radio programming." *Id.* at 134. Instead, "Sirius XM's programming was available to any person with a satellite-enabled radio that contracted with Sirius XM to receive programming," and "the purpose of the contract, from the standpoint of the subscriber, was the ability to receive the programming through his or her satellite-enabled radio." *Id.* at 135.

Like the district court, we disagree with this understanding of the service Sirius performs. In tax cases, courts must "not disregard the economic realities underlying the transactions in issue." *Combs v. Roark Amusement & Vending, L.P.*, 422 S.W.3d 632, 637 (Tex. 2013). The economic reality here is that Sirius is a radio production and broadcasting company operating dozens of satellite radio channels from locations outside Texas. Characterizing the service Sirius performs as "decryption" elevates the technicalities of the transaction over the economic reality of the service performed. It is of course true—in a narrow, technical sense—that a Sirius subscriber pays to have his radio

---

[8] Sirius alleges that the court of appeals improperly deferred to the Comptroller's interpretation of the statute. In Sirius's view, the statutory requirement that trial on contested franchise taxes be *de novo*, TEX. TAX CODE § 112.054, precludes the application of deference to agencies because the courts must "try each issue of fact and law . . . as though there had not been an intervening agency action or decision," TEX. GOV'T CODE § 2001.173. The Comptroller, however, does not ask for deference and does not attempt to defend the court of appeals' decision on deference grounds. Because the Comptroller asks for no deference, we need not decide whether its position is entitled to any special consideration.

set decrypt a signal. But the economic reality of Sirius's business is that decryption is not a service performed for the benefit of the customer at all. Sirius's encryption-decryption model is not for the customer's benefit. It is for Sirius's benefit. Encryption is a barrier to access imposed by Sirius—an artificial way to manufacture scarcity—in order to extract subscription payments from customers. Those customers want to listen to radio content. They do not want decryption. They would prefer to have the content without the decryption, which would make the content free. Sirius, of course, would not make money that way.

Characterizing the service Sirius performs for Texans as "decryption of radio sets in Texas" is like saying the service performed by *The Wall Street Journal Online* is a "paywall-removal service," rather than the creation and distribution of news and opinion content its subscribers want to read. But Sirius is no more in the "decryption business" than *The Wall Street Journal* is in the "paywall-removal business." Both impose an artificial barrier to render more profitable what would otherwise be a freely available—and perhaps economically unviable—product. No one would pay for Sirius's decryption without Sirius's radio content. No one would *need* to pay for Sirius's radio content without decryption, but the radio content would still be a valuable service. Encryption allows Sirius to capture a share of that value, but decryption is obviously not the useful labor that Sirius performs.[9]

---

[9] Many of Sirius's customers may never receive a single activation or deactivation signal for their chip set, as they will drive their new car off the lot

Even if "decryption" were the relevant service, Sirius still does not perform it in Texas. The record does not reflect any evidence that Sirius sends its activation signals to initiate decryption in the chip set from personnel or equipment within Texas. By all accounts, it has no personnel or equipment here, aside from a small number of terrestrial repeaters servicing a limited area. Thus, the decryption "service"—even if it mattered—is performed from outside Texas, at the "point of transmission." Hearing No. 10,028, 1980 WL 5466, at *5.

To the extent that the Comptroller's argument relies on the presence of equipment in Texas—the car radios that receive signals from Sirius—it is important to note that the receipts at issue here are from subscriptions paid for access to radio content, not from the sale or lease of radio sets. Even if Sirius "controls" the chip sets in the sense that it alone can activate or deactivate them, Sirius does not own the equipment in each subscriber's car. The customer owns it. The radio set itself is a physical good, not a service, so its transfer to the customer would be taxed under a different scheme, if at all. The receipts in dispute are from monthly subscriptions, not from the provision of radio sets, which have been installed in nearly every new car sold for at least the last decade, whether or not the driver ever pays for Sirius's services.

In sum, Sirius has little personnel or equipment in Texas that performs the radio production and transmission services for which its

---

with an active trial subscription and renew it each time without fail. Customers who renew their initial subscriptions do not want Sirius to affirmatively "decrypt" their signal but instead want Sirius to decline to re-encrypt the signal. The non-performance of such an act is surely not the "service performed" by Sirius for tax purposes.

customers pay monthly subscription fees.  The court of appeals' decision apportioning to Texas all of Sirius's receipts from Texas subscribers must be reversed.

**D**

Even under our holding today, the parties would agree that some small amount of Sirius's services were performed in Texas. Unchallenged Comptroller regulations require that, when services are performed inside and outside of Texas, the taxpayer must apportion to Texas the "fair value of the services that are rendered in Texas." Former 34 TEX. ADMIN. CODE § 3.591(e)(26).[10]  To establish the fair value of its services in Texas, Sirius submitted in the district court a study showing the cost of performing its services.  The district court accepted this analysis as sufficient evidence of fair value.  The court of appeals rejected it, but it did so only after agreeing with the Comptroller on the underlying question of how to apportion Sirius's subscription receipts.  604 S.W.3d at 135–37.

Sirius did not raise this issue in its petition for review, but the Comptroller briefed the issue as an alternative ground for affirmance. The Comptroller contends that even if Sirius prevails on all other points, there was still legally insufficient evidence establishing the fair value of Sirius's services performed in Texas.  The Comptroller takes issue with Sirius's cost-based analysis of fair value, including its treatment of its FCC license, its handling of its subsidies, its apportionment of consulting fees, and so on.

---

[10] Counsel for the Comptroller agreed at oral argument that, in this rule, "rendered" means the same thing as "performed."

As the court of appeals recognized, any assessment of the evidence necessary to establish the fair value of services performed in Texas hinges on which services are considered "performed in this state." The court of appeals engaged in no analysis of the appropriateness of cost-based methods as such. Instead, its conclusion that Sirius failed to present sufficient evidence of fair value flowed from its view that the district court had misidentified the relevant service performed by Sirius. *Id.* Because we now reverse on that predicate question, the basis for the court of appeals' objection to Sirius's fair-value evidence falls away.

No court has yet considered the Comptroller's argument that the evidence of fair value Sirius proffered in the district court is insufficient to support the district court's judgment even if Sirius is right about how to apportion its services. If the Comptroller continues to take that position after today's decision, it may raise the issue in the court of appeals on remand.[11]

### III

The judgment of the court of appeals is reversed. The case is remanded to the court of appeals for further proceedings consistent with this opinion.

---

[11] The Comptroller contends that if we reverse the court of appeals' judgment, we will have to reject the district court's judgment too because it also deployed the "receipt-producing, end-product act" standard. We disagree. The district court found that Sirius's receipt-producing act was producing and broadcasting radio content. It appears to have used the "receipt-producing act" formulation because the Comptroller insisted it be used. Whatever label the district court used at the Comptroller's request, as a practical matter it appears the district court applied the correct, origin-based method of apportioning Sirius's services, consistent with our decision today.

20

_____
James D. Blacklock
Justice

**OPINION DELIVERED:** March 25, 2022