# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## ON MOTION FOR REHEARING

## NO. 03-14-00397-CV

**Appellant, American Multi-Cinema, Inc.** // **Cross-Appellants, Glenn Hegar, Comptroller of Public Accounts of the State of Texas; and Ken Paxton, Attorney General of the State of Texas**

**v.**

**Appellees, Glenn Hegar, Comptroller of Public Accounts of the State of Texas; and Ken Paxton, Attorney General of the State of Texas // Cross-Appellee, American Multi-Cinema, Inc.**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT NO. D-1-GN-12-003831, HONORABLE ORLINDA NARANJO, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

We withdraw our opinion and judgment issued on April 30, 2015, and substitute the following opinion and judgment in their place. We overrule appellees cross-appellants' motion for rehearing.

Appellant cross-appellee American Multi-Cinema, Inc. (AMC) sued appellees cross-appellants the Comptroller of Public Accounts and the Attorney General (collectively the

Comptroller)[1] to recover franchise taxes paid under protest for report years 2008 and 2009. *See* Tex. Tax Code §§ 112.051–.060, 171.001–.1012. The case was tried before the bench in two phases. The Comptroller appeals the trial court's ruling in phase one, and AMC appeals the trial court's ruling in phase two. For the reasons that follow, we affirm the trial court's judgment in part and reverse and render in part.

## BACKGROUND

AMC is in the movie theater business, primarily exhibiting films and other content to its customers. For tax report years 2008 and 2009, AMC determined its taxable margin for purposes of calculating its Texas franchise tax by subtracting its cost of goods sold (COGS) from its total revenue. *See id.* §§ 171.101 (allowing taxable entity to subtract cost of goods sold to determine taxable margin for franchise tax calculation), .1012 (addressing how cost of goods sold determined); *see generally Combs v. Newpark Res., Inc.*, 422 S.W.3d 46, 47–8 (Tex. App.—Austin 2013, no pet.) (describing structure and formula for calculating franchise tax, which is "tax on the value and privilege of doing business in Texas" (citing *In re Nestle USA, Inc.*, 387 S.W.3d 610, 612 (Tex. 2012) (orig. proceeding))). AMC included its costs of exhibiting films and other content (exhibition costs) as COGS for those years. *See* Tex. Tax Code § 171.1012(c) (including "all direct costs of acquiring or producing the goods" as COGS). After an audit, the Comptroller disallowed those costs, resulting in AMC's owing additional franchise taxes. AMC paid the additional franchise

---

[1] Glenn Hegar, in his official capacity as the Texas Comptroller of Public Accounts, is substituted for Susan Combs, and Ken Paxton, in his official capacity as the Attorney General, is substituted for Greg Abbott. *See* Tex. R. App. P. 7.2(a).

taxes under protest and brought this suit, asserting that its exhibition costs were properly included in the COGS subtraction. *See id.* §§ 171.101, .1012.

The parties agreed to a bifurcated bench trial. In phase one, the trial court considered whether AMC was entitled to include its exhibition costs in its COGS subtraction. *See id.* § 171.1012. The parties disputed whether AMC's product amounts to a "good" as that term is defined in section 171.1012(a) of the Tax Code. *See id.* § 171.1012(a). "'Goods' means real or tangible personal property sold in the ordinary course of business of a taxable entity." *Id.* § 171.1012(a)(1). Among other definitions, the statute defines "tangible personal property" to mean:

(i)     personal property that can be seen, weighed, measured, felt, or touched or that is perceptible to the senses in any other manner;

(ii)    films, sound recordings, videotapes, live and prerecorded television and radio programs, books, and other similar property embodying words, ideas, concepts, images, or sound, without regard to the means or methods of distribution or the medium in which the property is embodied, for which, as costs are incurred in producing the property, it is intended or is reasonably likely that any medium in which the property is embodied will be mass-distributed by the creator or any one or more third parties in a form that is not substantially altered.

*Id.* § 171.1012(a)(3)(A)(i), (ii).[2]  "'Tangible personal property' does not include: (i) intangible property; or (ii) services." *Id.* § 171.1012(a)(3)(B).

To support its position that its product falls within the definition of "goods" in section 171.1012, AMC called two of its vice presidents who testified about AMC's business, its film product, and AMC's "production steps" from the time it receives a film from a movie studio to

_____

[2] The statute also defines "tangible personal property" as "a computer program, as defined by Section 151.0031." Tex. Tax Code § 171.1012(a)(3)(A)(iii).

exhibiting the film. To support his position that AMC's product does not constitute "goods," the Comptroller called an entertainment lawyer who testified about the film industry, the types of businesses within that industry—film producers, distribution companies, and film exhibitors—and the meaning of terms in the industry such as "film production" and "film distribution." According to the Comptroller's witness, AMC is not a film producer or distributor, but a "film exhibition company," and AMC's customers do not purchase goods but "the right to observe the movie in the theater."

After phase one was concluded, the trial court ordered that "AMC was entitled to include the costs to exhibit films to its customers in its Cost of Goods Sold subtraction under Section 171.1012 of the Tax Code" and ordered the parties to schedule a date for phase two of the trial "to determine the refund amount." Prior to phase two, the parties reached an agreement delineating the majority of exhibition costs that AMC could include in the COGS subtraction. The parties, however, were unable to agree about certain facility-related costs, such as rent and depreciation, associated with the square footage of AMC's movie theater auditoriums and proceeded to phase two of the trial to resolve this dispute. *See id.* § 171.1012(c) (including within COGS "all direct costs of acquiring or producing the goods," such as depreciation and "cost of renting or leasing equipment, facilities, or real property directly used for the production of the goods").

The parties joined issue on the percentage of the auditorium space that should be considered for determining direct costs of "production." *See id*. § 171.1012(a)(2) (defining "production"), (c). AMC asserted that the costs associated with the entire square footage of its auditoriums should be included in the COGS calculation, and AMC's witness testified about the

4

sight, sound, and the controlled environment in its auditoriums. The Comptroller countered that the only costs that should be included were costs associated with the square footage occupied by the speakers and the screens in the auditoriums. The Comptroller did not call witnesses, supporting its arguments based on the common knowledge of a moviegoer.

The parties stipulated to each side's competing calculation of the amount of AMC's refund, depending on the trial court's resolution of the parties' dispute concerning the allowable percentage of costs related to the auditorium space, as follows:

> If the Court agrees with AMC's position that 67.67% of the disputed costs qualify, the tax refund amounts due Plaintiff are $579,656 for Report Year 2008 and $591,293 for Report Year 2009. If the Court agrees with Defendants' position that 13.42% of the disputed costs qualify, the tax refund amount[s] due Plaintiff are $229,709 for Report Year 2008 and $269,959 for Report Year 2009. Plaintiff is also due assessed penalty, assessed interest, and statutory interest.

In its final judgment, the trial court agreed with the Comptroller as to the costs associated with the amount of the auditoriums' square footage that should be included and ordered refunds based on the corresponding stipulated amounts for report years 2008 and 2009. The trial court ordered the Comptroller to issue one or more refund warrants to AMC in the amount of $499,668 in franchise tax, plus appropriate interest and penalties. The trial court also made separate findings of fact and conclusions of law as to both phases of the trial. These cross-appeals followed.

**STANDARDS OF REVIEW**

The parties' issues concern statutory construction, a question of law that we review de novo. *See First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 631 (Tex. 2008). Our primary

concern in construing a statute is the express statutory language. *See Galbraith Eng'g Consultants, Inc. v. Pochucha*, 290 S.W.3d 863, 867 (Tex. 2009). "We thus construe the text according to its plain and common meaning unless a contrary intention is apparent from the context or unless such a construction leads to absurd results." *Presidio Indep. Sch. Dist. v. Scott*, 309 S.W.3d 927, 930 (Tex. 2010) (citing *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625–26 (Tex. 2008)). We "'read the statute as a whole and interpret it to give effect to every part.'" *Railroad Comm'n of Tex. v. Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 628 (Tex. 2011) (quoting *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 25 (Tex. 2003)). Further, a precondition to deference to an agency's interpretation of a statute is ambiguity. *See Combs v. Roark Amusement & Vending, L.P.*, 422 S.W.3d 632, 635 (Tex. 2013) (describing agency-deference doctrine); *Combs v. Health Care Servs. Corp.*, 401 S.W.3d 623, 629–30 (Tex. 2013) (same). And "[t]axing statutes are construed strictly against the taxing authority and liberally for the taxpayer." *See Morris v. Houston Indep. Sch. Dist.*, 388 S.W.3d 310, 313 (Tex. 2012).

The parties also challenge the trial court's findings of fact and conclusions of law. We review the trial court's findings of fact for legal and factual sufficiency of the evidence by the same standard applied to a jury verdict. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996); *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991); *see City of Keller v. Wilson*, 168 S.W.3d 802, 827–28 (Tex. 2005) (describing legal sufficiency standard of review); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (describing factual sufficiency standard of review). We review a trial court's conclusions of law de novo to determine their correctness and will uphold conclusions if the judgment can be sustained on any legal theory supported by the evidence. *BMC Software*

6

*Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). Further "we will not reverse an erroneous conclusion if the trial court rendered the proper judgment." *City of Austin v. Whittington*, 384 S.W.3d 766, 779 n.10 (Tex. 2012); *see BMC Software*, 83 S.W.3d at 794.

## ANALYSIS

**Comptroller's Cross-Appeal**

In his cross-appeal, the Comptroller asserts in one issue that the trial court erred in concluding that AMC may include its exhibition costs in its COGS subtraction under section 171.1012 of the Tax Code for report years 2008 and 2009. *See* Tex. Tax Code § 171.1012. According to the Comptroller, exhibiting films does not constitute a "good" because AMC does not sell "tangible personal property" but intangible property, or a film-watching service, or non-property. *See id.* § 171.1012(a)(1) (defining "goods" to include "tangible personal property"), (3)(A) (defining "tangible personal property"), (3)(B) (excluding "intangible property" and "services" from definition of "tangible personal property").

As part of his issue, the Comptroller challenges the legal sufficiency of the evidence to support the trial court's finding of fact no. 4, which states:

> When AMC exhibits movies and other content to its paying customers, it produces personal property that can be seen, weighed, measured, felt, or touched or that is perceptible to the senses in any other manner for sale in its ordinary course of business.

7

This finding of fact tracks one of the definitions of "tangible personal property" in section 171.1012(a)(3)(A) of the Tax Code. *See id*. § 171.1012(a)(3)(A)(i). The Comptroller also challenges the trial court's conclusion of law no. 2, which states:

> When AMC exhibits movies and other content to its paying customers, AMC produces goods for sale in the ordinary course of business under Section 171.1012, and may therefore include the costs of exhibiting movies and other content to its paying customers in its cost-of-goods-sold deduction under Section 171.1012 of the Texas Tax Code.

*See id*. § 171.1012(a)(1) (defining "goods"), (b) (allowing taxable entity to subtract its cost-of-goods-sold for purpose of determining taxable margin), (c) (including "all direct costs of acquiring or producing the goods" as COGS).

The Comptroller's issue turns on the meaning of "goods" as that term is defined in section 171.1012(a)(1). *See Roark Amusement*, 422 S.W.3d at 636 ("If a term is expressly defined by statute, [courts] must follow that definition."); *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009) ("We do not look to the ordinary, or commonly understood meaning of the term because the Legislature has supplied its own definition, which we are bound to follow." (citing Tex. Gov't Code § 311.011(b))). As previously stated, subsection (a)(1) of section 171.1012 defines "goods" to mean "tangible personal property sold in the ordinary course of business of a taxable entity." Subsection (a)(3)(A)(i) defines "tangible personal property" to mean "personal property that can be seen, weighed, measured, felt, or touched or that is perceptible to the senses in any other manner." Tex. Tax Code § 171.1012(a)(3)(A)(i). Subsection (a)(3)(A)(ii) also defines "tangible personal property" to mean:

films, sound recordings, videotapes, live and prerecorded television and radio programs, books, and other similar property embodying words, ideas, concepts, images, or sound, without regard to the means or methods of distribution or the medium in which the property is embodied, for which, as costs are incurred in producing the property, it is intended or is reasonably likely that any medium in which the property is embodied will be mass-distributed by the creator or any one or more third parties in a form that is not substantially altered.

*Id*. § 171.1012(a)(3)(A)(ii). The parties do not assert, nor do we find, that the relevant language of section 171.1012 is ambiguous. Thus, we construe the text of the statutory definitions according to its "plain and common meaning." *See Scott*, 309 S.W.3d at 930.

As a threshold matter, the Comptroller argues that AMC only prevailed on its theory under section 171.1012(a)(3)(A)(i) and that the trial court correctly concluded that AMC does not produce "goods" as described by section 171.1012(a)(3)(A)(ii). To support its position that the trial court reached this conclusion, the Comptroller argues that the trial court did not include a finding of fact or conclusion of law to show that AMC prevailed on its theory under section 171.1012(a)(3)(A)(ii) even though AMC requested the following conclusion: "When AMC's customers purchase movie tickets and experience the content of a film, they buy 'tangible personal property' as defined in Tax Code § 171.1012(a)(3)(A)(ii)." The trial court also included a finding of fact as to section 171.1012(a)(3)(A)(i) without including a finding as to section 171.1012(a)(3)(A)(ii). *See generally* Tex. R. Civ. P. 298 (addressing requests for amended or additional findings), 299 (addressing omitted findings).

The trial court's conclusion of law no. 2, however, refers to section 171.1012, which necessarily includes both subsections (a)(3)(A)(i) and (a)(3)(A)(ii). And a trial court generally is not

9

required to make additional findings "if the requested findings will not result in a different judgment." *See Flanary v. Mills*, 150 S.W.3d 785, 792 (Tex. App.—Austin 2004, pet. denied); *see also Associated Tel. Directory Publishers, Inc. v. Five D's Publ'g Co.*, 849 S.W.2d 894, 901 (Tex. App.—Austin 1993, no writ) ("A trial court is not required to set out in detail every reason or theory by which it arrived at its final conclusions."). A finding under subsection (a)(3)(A)(ii) would not have altered the judgment. Thus, we conclude that AMC is entitled to include its exhibition costs in its COGS calculation if either subsection applies. *See Marchand*, 83 S.W.3d at 794 (upholding conclusions if the judgment can be sustained on any legal theory supported by the evidence).

Because it is dispositive, we limit our review of the evidence to AMC's theory under section 171.1012(a)(3)(A)(ii) and expressly do not resolve whether the evidence also supports the trial court's finding that AMC's product falls within the definition of "tangible personal property" in section 171.1012(a)(3)(A)(i). *See id.*; *see also* Tex. R. App. P. 47.1. As previously stated, for purposes of the COGS calculation, subsection (a)(3)(A)(ii) defines "tangible personal property" to mean "films . . . without regard to the means or methods of distribution or the medium in which the property is embodied." *See* Tex. Tax Code § 171.1012(a)(3)(A)(ii); *Roark Amusement*, 422 S.W.3d at 636 (requiring court to follow statutory definition of term). Because the legislature did not define the terms "distribution," "film," "medium," and "embodied," we apply the common meaning of those terms. *See Scott*, 309 S.W.3d at 930. Common meanings of "distribute" are "to deal out" and "to give out and deliver." *Webster's Third New Int'l Dictionary* 660 (2002). A common meaning of "film" is "motion picture," *id.* at 850; "medium" is "something through or by which something

10

is accomplished, conveyed, or carried on," *id.* at 1403; and "embody" means "to give a body to" and "to cause to become material or sensual," *id*. at 739.

AMC presented evidence to support its position that its film product falls within the statutory definition of "tangible personal property" as described in section 171.1012(a)(3)(A)(ii). One of AMC's witnesses testified that AMC was "the second largest film distributor in our industry," that "[f]ilm exhibition is the primary channel of film distribution," and that AMC "buy the product and we distribute it to our guests—our consumers." He also answered "Yes" when asked: "So is AMC involved in the delivery of the movie to the consumer?" and "Is that actual screen up there—what I'll call the big screen—is it kind of a medium on which the movie is embodied?" He described the process from the time that AMC receives a film to the time the film is shown in AMC's theaters as follows:

> The film comes in to us in multiple parts, multiple pieces, from multiple locations. We take that 35-millimeter film. We construct. We assemble. We put the advertisements. We put the public service announcements. We put the trailers. We put the feature film. We put the cues for the lights, the curtains, all in one contiguous piece of 35-millimeter celluloid film.
>
> Once we've constructed—assembled it if it's damaged in any way, we may remove any damaged parts simply by cutting them out and splicing them back together. We then install that on a platter. That is then fed through a 35-millimeter projector. Then those images are produced on a screen for the sight and sound consumption of our guests.

He also described the means or method of distribution as follows:

> We are producing an image on the screen. The screen is reflecting the image for you to see. We are sending sounds, signals through the—to our speakers, and you're hearing them—the actual production of the speakers.

11

And he answered "Absolutely" when asked if the definition of "tangible personal property" in section 171.1012(a)(3)(A)(ii) "fit what actually goes on in that movie theater." Another witness called by AMC agreed that AMC's product falls within this definition; answered "Yes, they are" when asked if AMC's films were mass distributed; and answered "Yes" when asked "Does AMC engage in distribution as it's commonly used?" He testified that the film is "chemically printed" on the 35-millimeter celluloid and agreed that the film was embodied on the celluloid. AMC also presented evidence that the creative content of the films is not substantially altered.

The Comptroller argues that AMC's product does not fall within the meaning of "tangible personal property" because it is either "intangible property" or a movie-viewing "service." *See* Tex. Tax Code § 171.1012(a)(3)(B) (excluding "intangible property" and "services" from definition of "tangible personal property"). Because the statute does not define "intangible property" or "services," we apply their common and ordinary meanings. *See Scott*, 309 S.W.3d at 930. "Intangible property" means "property having no physical substance apparent to the senses: incorporeal property (as choses in action) often evidenced by documents (as stocks, bonds, notes, judgments, franchises) having no intrinsic value or by rights of action, easements, goodwill, trade secrets." *Webster's* at 1173. "'[S]ervice' is defined as "the performance of work commanded or paid for by another." *Newpark*, 422 S.W.3d at 54 n.8 (defining "service" according to common meaning in context of section 171.1012 and citing definition in *Webster's*); *see also Webster's* at

12

2075 (defining "service," among other meanings, as "useful labor that does not produce a tangible commodity"), 458 (defining commodity as "economic good").[3]

According to the Comptroller, AMC does not sell the film, but the right to watch the film at a certain time and place. The Comptroller focuses on the customer's purchase of a ticket, which the Comptroller contends is a license, and the fact that AMC's customers leave AMC's theaters with experiences and memories but without a copy of the film. *See Rylander v. Bandag Licensing Corp.*, 18 S.W.3d 296, 298 (Tex. App.—Austin 2000, pet. denied) (describing licensing of patents as intangible property rights); *Jordan v. Concho Theatres*, 160 S.W.2d 275, 276 (Tex. Civ. App.—El Paso 1941, no writ) ("A ticket to a theatre is a mere revocable license."). But the definitions of "tangible personal property" in section 171.1012 do not have a take-home requirement. *See Roark Amusement*, 422 S.W.3d at 637 (declining to engraft extra-statutory requirements "under the guise of interpreting it").

---

[3] In his motion for rehearing, the Comptroller for the first time cites the definition of "tangible personal property" and definitions of services in chapter 151 of the Tax Code, which chapter addresses Texas sales, excise, and use taxes. *See, e.g.*, Tex. Tax Code §§ 151.0028(a) (defining "amusement services"), .009 (defining "tangible personal property"), .0101(1) (defining "taxable services" to include "amusement services"); *see also* 34 Tex. Admin. Code § 3.298(a)(1)(A)(iv) (Comptroller of Pub. Accounts, Amusement Services) (defining "amusement services" to include "motion pictures"). Had the legislature intended to incorporate the definitions of "tangible personal property" and amusement and other services from chapter 151, however, it could have done as it did as to the definition of "computer programs" in section 171.1012(a)(3)(A)(iii). *See* Tex. Tax Code § 171.1012(a)(3)(A)(iii) (defining "computer program" as defined in section 151.0031); *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011) ("We presume that the Legislature chooses a statute's language with care, including each word chosen for a purpose, while purposefully omitting words not chosen."); *Riverside Nat'l Bank v. Lewis*, 603 S.W.2d 169, 175 (Tex. 1980) (holding because legislature knew how to include terms within statutory definition and did not do so, statutory definition did not include terms "in light of [the term's] contemporaneous inclusion of the same terms in [a separate provision]").

The Comptroller's proposed interpretation of section 171.1012 is also at odds with a subsequent amendment to the statute. *See* Act of June 14, 2013, 83d Leg., R.S., ch. 1232, § 10(a), 2013 Tex. Gen. Laws 3104, 3108 (current version at Tex. Tax Code § 171.1012(t)); *see also* Tex. Gov't Code § 311.023 (courts may consider "object sought to be obtained," "legislative history," and "consequences of a particular construction" when construing statute "whether or not the statute is considered ambiguous on its face"). Section 171.1012 was amended in 2013 to add subsection (t), which states:

> If a taxable entity that is a movie theater elects to subtract cost of goods sold, the cost of goods sold for the taxable entity shall be the costs described by this section in relation to the acquisition, production, exhibition, or use of a film or motion picture, including expenses for the right to use the film or motion picture.

Tex. Tax Code § 171.1012(t). The Comptroller concedes that AMC may include its exhibition costs based on subsection (t) going forward. The plain language of this provision makes clear that AMC's costs associated with its film product may be used in its COGS calculation, and the same section of the act that amended section 171.1012 to add subsection (t) expressly stated: "Section 171.1012(t), Tax Code, as added by this section, is a clarification of existing law and does not imply that existing law may be construed as inconsistent with the law as amended by this section." *See* Act of June 14, 2013, § 10(b), 2013 Tex. Gen. Laws at 3108; *Public Util. Comm'n v. Cities of Harlingen*, 311 S.W.3d 610, 620 (Tex. App.—Austin 2010, no pet.) (relying on subsequent legislation that clarified Commission's authority).

Although the Comptroller presented evidence to support his position that AMC's product was not "tangible personal property," it was within the province of the trial court to resolve

14

conflicts in the evidence in favor of AMC. *See City of Keller*, 168 S.W.3d at 819–20. Applying the plain meaning of "tangible personal property" as that phrase is defined in section 171.1012(a)(3)(A)(ii) in the context of the statute and viewing the evidence under the applicable standard of review, we conclude that the trial court did not err in concluding that AMC was entitled to include its exhibition costs in its COGS subtraction. *See BMC Software*, 83 S.W.3d at 794. Thus, we overrule the Comptroller's issue on cross-appeal.

**AMC's appeal**

In one issue, AMC challenges the trial court's ruling in phase two that only AMC's costs associated with the square footage housing the speakers and screens in AMC's auditoriums qualified as COGS under section 171.1012. AMC contends that the trial court erred in deferring to the Comptroller's interpretation of section 171.1012 to determine the amount of franchise taxes owed and that the "undisputed evidence conclusively proved that costs associated with the entire auditorium were direct costs of producing the films AMC sells to its customers." *See* Tex. Tax Code § 171.1012(c). AMC urges that it "uses the entire auditorium space in 'production,' as unambiguously defined by Tax Code section 171.1012(a)(2)." *See id*. § 171.1012(a)(2).

As part of its issue, AMC challenges the trial court's conclusion of law no. 3, which states:

> Interpretations given to statutes by state agencies are entitled to deference when, as here, a tax arguably applied and the court is weighing competing interpretations of the amount owed. The Comptroller's interpretation of the amount owed in the present case is reasonable under the plain language of Section 171.1012, Tax Code.

15

AMC argues that the trial court erred by deferring to the Comptroller's interpretation of the statute because section 171.1012(a)(2), which defines "production," is not ambiguous. *See id*. We agree. Thus, we conclude that the trial court erred by concluding that the Comptroller's interpretation was entitled to deference. *See Roark Amusement,* 422 S.W.3d at 635 (requiring ambiguity as precondition to deferring to agency's interpretation of statute). The issue then is whether the "trial court rendered the proper judgment" as to the amount of refund owed to AMC despite this erroneous conclusion of law. *See Whittington*, 384 S.W.3d at 779 n.10; *BMC Software*, 83 S.W.3d at 794.

In this context, AMC challenges the trial court's finding of fact no. 8, and relatedly nos. 7, 9, and 10, which address AMC's exhibition costs and the amount of AMC's refund for report years 2008 and 2009 based on those costs. The challenged findings state:

7. 13.42% of the Disputed Costs are exhibition costs. This includes 75% of the costs associated with the square footage used to sell concessions, which the parties stipulate is 2.19% of the Disputed Costs. This also includes 100% of the costs associated with the square footage used to project the movies and alternative content into the auditorium, which the parties stipulate is 9.67% of the Disputed Costs. Finally, this includes 100% of the costs associated with the square footage of AMC's auditoriums housing the speakers and screens, which the parties stipulate is 1.56% of the Disputed Costs. This adds up to 13.42% of the Disputed Costs.

8. The costs associated with the square footage for the auditoriums, other than the square footage housing the speakers and screens, are not exhibition costs.

9. Based on 13.42% of the AMC's cost-of-goods-sold for Report Year 2008 is $1,091,269,621. AMC's refund for Report Year 2008 is $229,709, plus assessed interest, penalty, and statutory interest.

10. AMC's cost-of-goods sold for Report Year 2009 is $1,108,701,467. AMC's refund for Report Year 2009 is $269,959, plus assessed interest, penalty, and statutory interest.

16

The percentages of the disputed costs associated with the square footage of the auditoriums and the corresponding amounts of refunds in findings nos. 7, 9, and 10 follow from the parties' stipulations in the event that the trial court ruled in favor of the Comptroller as to the parties' dispute about costs associated with AMC's auditorium space.

AMC contends that finding of fact no. 8 is erroneous because it is not based on evidence offered at trial and, therefore, that the trial court's related findings based on the parties' stipulations as to the Comptroller's calculations of the amounts owed also are erroneous. According to AMC, its evidence "established that the auditorium is integral to the visual and acoustic production" and that it uses the entire auditorium space in "production" as that term is defined in section 171.1012(a)(2). *See* Tex. Tax Code § 171.1012(a)(2); *Roark Amusement*, 422 S.W.3d at 636; *Entergy*, 282 S.W.3d at 437. Section 171.1012(a)(2) defines "production" broadly to include "construction, installation, manufacture, development, mining, extraction, improvement, creation, raising, or growth." Tex. Tax Code § 171.1012(a)(2); *see* Tex. Gov't Code § 311.005(13) (use of word "includes" is term of enlargement and "not of limitation or exclusive enumeration"); *see also* Tex. Tax Code § 171.1012(c) (defining COGS to "include[] all direct costs of acquiring or producing the goods"). Relevant to this appeal, the words "creation" and "improvement" are not defined in the statute so we apply their common meanings. *See Scott*, 309 S.W.3d at 930. "Create" means "to bring into existence," *Webster's* at 532, and "improve" means "to make greater in amount or degree" and "to enhance in value or quality." *Id*. at 1138.

AMC's witness in phase two testified about AMC's "improvement" and "creation" of its film product in its auditorium space. He testified about the sight, sound, and lighting in the

17

auditorium space and described the way that AMC sets up this space "both from an acoustic integrity perspective and the way we—what we call EQ, or equalized each of those cinema auditorium spaces." He testified as follows:

> Certainly, we improved on what we're originally provided by our studio partners because if we did not, if you were to go to one of our theaters and that auditorium did not have an auditorium specific sound EQ or equalization, the dialogue would not be as intelligible, the surround coverage and the associate of what we call SPLs or sound pressure levels, some of them would be too loud; some of them would be too high or hot as we call it. You might not have enough low frequency.
>
> We definitely change what we are originally providing from our studio partners and we create a unique audio and visual experience.
>
> Now, on the visual side, we do it specific to the screen type. The screen gave basically what type of screen vinyl is used in the auditorium, what type of projector is used.
>
> Everything has to be combined and that combination is what really creates the unique auditorium specific entertainment experience.
>
> . . . .
>
> A lot of the overall auditorium design is driven by, I mean, on the audio side, how many surrounds we need, what the spacial distance, physical distance between surround so that every patron gets equivalent and equal quality and coverage. The screen—both the screen type, the screen game, the screen size, everything is—they are all taken into account to where we meet, you know, both competitive and technology industry standards. . . .
>
> . . . .
>
> So everything is taken into account, and truly, we are realtime changing what comes out of the projection booth based on what's in the auditorium.
>
> . . . .
>
> There are literally dozens and dozens and dozens of different technical elements that go into the design and the eventual implementation inside each theater auditorium.

AMC's witness also answered "Yes" when asked if the auditorium was "directly used for production." He further described the auditorium space as "an acoustic chamber," "production area" and "controlled environment with multi dimensional surround audio" and testified that "there is creation going on in that auditorium in near realtime."

During phase two, the Comptroller asserted facts based on the common experiences of moviegoers.[4] The Comptroller's counsel argued in his opening statement:

> And, honestly, Judge, I don't even think you need evidence in this case, unless you have never been to a movie theater before, because you know what happen[s] in a movie theater just as well as anyone else does. They can explain in greater detail, but the point for this case is, where is—what they have—when they turned this 35-millimeter film into a product for the customers, where does that happen? It happens in the projectors, the screens, and the speakers. And I don't think anything they can say will change that. What happened in the auditorium is not relevant.

The Comptroller asserted that there is "consumption space" and "production space," that only production space counts, and that the auditoriums are consumption space. According to the Comptroller's position, AMC's "goods"—the "sights and sounds" of the film—"are produced in the screens and speakers" and "experienced, not produced, in the auditoriums."[5] The Comptroller, however, did not call any witnesses to rebut AMC's evidence or otherwise present evidence during phase two regarding the design and function of AMC's auditorium space to support his factual assertions.

---

[4] Similarly, the Comptroller argues on appeal that "the facts needed to decide this appeal are common knowledge to anyone who watches movies in movie theaters."

[5] Both at trial and on appeal, the Comptroller equates the experience of watching a film in a theater with watching a DVD on a television at home.

19

The plain text of section 171.1012(a)(2) also does not support the Comptroller's theory that production space and consumption space are mutually exclusive. *See Roark Amusement*, 422 S.W.3d at 637 (declining to engraft extra-statutory requirements); *City of Rockwall*, 246 S.W.3d at 629 (declining to read additional words into statute in construing statute). The definition of "production" does not reference or exclude costs that also are associated with consumption space. *See Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 540 (Tex. 1981) ("Only when it is necessary to give effect to the clear legislative intent can we insert additional words or requirements into a statutory provision.").

The Comptroller focuses on subsections (e)(1) and (3) of section 171.1012 to support his position that costs associated with the auditorium space, other than the screens and speakers, are not COGS. Subsections (e)(1) and (3) expressly exclude from COGS "the cost of renting or leasing equipment, facilities, or real property that is not used for the production of the goods" and "distribution costs, including outbound transportation costs." *See* Tex. Tax Code § 171.1012(e)(1), (3). AMC presented evidence at trial that the space of the entire auditorium was used in the "production"—as that term is defined in section 171.1012(a)(2)—of its film product, and the Comptroller did not present evidence to controvert AMC's evidence. *See id*. § 171.1012(a)(2); *Roark Amusement*, 422 S.W.3d at 636 (following definition in statute); *Entergy*, 282 S.W.3d at 437 (same).

Applying the plain meaning of "production" as defined in section 171.1012(a)(2) in the context of the statute and viewing the evidence under the applicable standard of review, we conclude that the evidence was legally and factually insufficient to support the trial court's finding

20

of fact no. 8 and, therefore, its related findings nos. 7, 9, and 10. *See City of Keller*, 168 S.W.3d at 827–28; *Cain*, 709 S.W.2d at 176. AMC's evidence established that its costs associated with the square footage of its auditoriums are direct costs of producing its product, and the Comptroller failed to present controverting evidence. *See* Tex. Tax Code § 171.1012(a)(2), (c). Thus, we sustain AMC's issue and, based on the parties' stipulations as to AMC's calculation of the amount of refund owed, render the judgment that the trial court should have rendered. *See* Tex. R. App. P. 43.3 (generally requiring appellate court to render judgment trial court should have rendered when reversing trial court's judgment).

**CONCLUSION**

For these reasons, we affirm the trial court's ruling as to phase one, reverse the trial court's ruling as to phase two, and render judgment, pursuant to the parties' stipulations, that AMC is entitled to a refund in the amount of $579,656 for report year 2008 and $591,293 for report year 2009, plus appropriate penalty and interest.

_____

Melissa Goodwin, Justice

Before Chief Justice Rose, Justices Goodwin and Field

Affirmed in Part; Reversed and Rendered in Part on Motion for Rehearing

Filed: January 6, 2017

21